## CONTINENTAL OIL CO. v. JONES.
### No. 3841.

United States Court of Appeals
Tenth Circuit.
June 29, 1949.

Harold Skinner, Holdenville, Okl. (James J. Cosgrove and R. O. Wilson, Ponca City, Okl., on the brief), for appellant.

Harry Marselli, Sp. Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty.

Gen., Ellis N. Slack, A. F. Prescott, and Louise Foster, Sp. Assts. to the Atty. Gen., and Robert E. Shelton, U. S. Atty., Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

Continental Oil Company [1] brought this action on two claims for refund of taxes paid on the transportation of oil by pipe line. Continental is an integrated oil company with separate and distinct departments devoted to the production, transportation, manufacturing, and marketing of petroleum and petroleum products. It owns and operates certain producing oil properties in the Tepetate and Ville Platte oil fields in Louisiana. Prior to July, 1936, the oil from the wells in such fields was produced by the usual and conventional method, that is, the oil flowed at high pressure from the mouth of the well into a separator where some of the lighter gases were vented off, and thence to the flow or settling tanks, where the water and basic sediment settled to the bottom. The oil was then drained off the top of the settling tanks into stock tanks on the leases. At the stock tanks, the oil was measured for royalty payments and then delivered to the pipe-line department for transportation. While undergoing the necessary settling and weathering process in the preparation for transportation, valuable hydrocarbon gases in solution were lost by evaporation. In the year 1936, Continental installed a field stabilization plant in each of the two oil fields to process the oil as it came from the wells so as to save valuable gases and high volatile liquids, theretofore wasted, and also to bring the oil to the required standard for acceptance by the pipe-line carrier.

Under the new method, the oil flows directly from the well mouth without interruption to separators adjacent to the wells, where the lighter gases are removed and saved. The oil then moves from the separators through a meter into the stabilization plant where it is further denuded of hydrocarbon or liquified gases and subjected to a desalting process. It then moves on through a master meter to 80,000-barrel storage tanks. The flowage of the oil from the well mouth through the separator, stabilization plant, master meter, and on into the storage tank is one continuous movement by initial well energy. However, during one step in the process it is necessary to reduce the pressure.

The new stabilization plants are located in about the center of the two fields, the Ville Platte plant serving 159 wells and the Tepetate plant serving 44 wells. The battery of storage tanks is located from 700 to 950 feet from the master meter. In such storage tanks, the pressure is reduced to atmospheric pressure, and some weathering process and cooling take place. When the oil moves from the stabilization plants to the storage tanks, the pressure is greater than atmospheric pressure and not until it is reduced to atmospheric pressure in the storage tanks will it be accepted by a pipeline company for transportation. Pipe-line carriers do not accept oil under other than at atmospheric pressure.

Continental also purchases crude oil of pipe-line grade from certain producing leases, in the area, not owned by it. This oil is transported by a net work of gathering pipe lines to a point in the line from the stabilization plants to the storage tanks, such point being a few feet from such tanks. Most of the purchased oil is subjected to the old-fashioned weathering process in settling tanks at the leases from which it is produced. A tax was assessed and paid on the transportation through the gathering lines of the purchased oil.

Continental owns and operates a main trunk pipe line extending from its Lake Charles Refinery through the Tepetate field to the Ville Platte field, a distance of 75 miles. Through that trunk line, oil is transported from such fields to the terminal at Lake Charles. Pumps, located adjacent to the storage tanks at the Tepetate and Ville Platte fields, are connected with the trunk line. After being gauged in the

---

[1] Hereinafter called Continental.

storage tanks, oil flows from such tanks through the pumps into the trunk line.

Two questions are presented: (1) whether the movement of oil from the fields' stabilization plants to the storage tanks is a gathering movement or is an essential part of the production process, and (2) whether the movement of oil from the storage tanks to the pumps is a gathering movement, or whether the trunk line transportation begins when the oil leaves the storage tanks. The only transportation tax involved is on the two movements last referred to above.

A tax on the transportation of oil by pipe line was first imposed by the Revenue Act of 1932, 47 Stat. 169. The Act has been amended from time to time, but the amendments have not changed the substance of the original provisions imposing the tax.[2] Subsection (c) of § 3460 of the Internal Revenue Code, 26 U.S.C.A. § 3460(c), in part provides:

"(c) Exempt transportation. For the purposes of this section, the term 'transportation' shall not include any movement through lines of pipe within the premises of a refinery, a bulk plant, a terminal, or a gasoline plant, if such movement is not a continuation of a taxable transportation. * * *"

Article 26, Treasury Regulations 42 (1932 edition) in part provides: "Art. 26. Basis of Tax.—The term 'all transportation of crude petroleum and liquid products thereof by pipe line' includes any such transportation by a carrier, either public or private, whether or not transported for hire, and whether or not the commodity transported is owned by the carrier. It also includes the transportation by private owner whenever the movement is substantially similar to movements which pipe-line carriers usually undertake and perform, if the movement is not merely local or incidental to another business or a related business engaged in by the person so transporting, such as the producing or refining of oil. Thus, where a refiner maintains

a trunk line or a gathering line from a refinery to an oil field or pool, the services which the refiner performs for himself are similar to those which pipe-line carriers would otherwise render. The refiner, therefore, should pay the tax as though he had in fact employed the services of a carrier. If, on the other hand, the movement is from storage tanks to stills which are a part of the same manufacturing unit, or from wells to flow tanks or storage tanks situated in the immediate vicinity, the movement is not such as a pipe-line carrier would normally render and consequently is not subject to the tax imposed under section 731."

Section 130.22 of Treasury Regulations 42 (1942 edition) in part provides:

"Sec. 130.22 *Gathering, Trunk Line, and Loading Services.*—The term 'gathering service' includes movements of crude petroleum or liquid products thereof through any pipe line reaching from wells, *flow tanks, or settling tanks in the area or field where the product is produced, to storage tanks,* a trunk line or main line, a refinery, or to market or any other point within the producing area or field, without regard to the size of the pipe, the length of the movement, or the quantity of the specified products carried through such line. Such term does not include a movement from wells to flow tanks, or settling tanks adjacent to the wells." (Italics ours.)

The trial court found that the movements in question were gathering movements and entered judgment for the Collector. Continental has appealed.

In Jones v. Continental Oil Co., 10 Cir., 141 F.2d 923, we held that the movement from the wells to the stabilization plants was not a gathering movement. We refused to pass on the question whether the movement from the stabilization plant to the storage tanks was a gathering movement for the reason that the tax in question in that case was not based upon such particular movement of oil.

[2] See § 1, Revenue Act of 1939, 53 Stat. 862; § 209, Revenue Act of 1940, 54 Stat. 516, 522; §§ 502 and 521, Revenue Act of 1941, 55 Stat. 687, 706; § 616, Revenue Act of 1942, 56 Stat. 798, 978.

522

 The doctrine of res judicata embodies two main rules which may be stated as follows:

(1) The final judgment or decree of a court of competent jurisdiction upon the merits concludes the parties and their privies to the litigation, and constitutes a bar to a new action or suit upon the same cause of action either before the same or any other tribunal.

(2) Any right, fact or matter in issue and directly adjudicated, or necessarily involved in the determination of an action before a competent court in which a judgment or decree has been rendered upon the merits, is conclusively settled by the judgment therein and cannot again be litigated between the same parties and their privies, whether the claim, demand, purpose or subject matter of the two suits is the same or not.[3]

. Here, a different tax period and a different movement of oil are involved and in the interim there has been a material change in the Regulations. It follows that neither of such rules is applicable here.[4]

 It seems clear to us that the movement from the stabilization plants to the storage tanks was a gathering movement as that phrase is defined by § 130.22, supra, and that the judgment below must be affirmed if that Regulation is valid.

It is well settled that an administrative construction of a statute by a Regulation must be deemed to have received legislative approval by the later reenactment of the statute without material change.[5] But here, we are dealing with taxes assessed after the adoption of the 1942 Regulations,[6] and in Helvering v. Wilshire Oil

Company, 308 U.S. 90, 100, 60 S.Ct. 18, 24, 84 L.Ed. 101, the court said: " * * * The oft-repeated statement that administrative construction received legislative approval by reenactment of a statutory provision, without material change (United States v. Dakota-Montana Oil Co., supra) covers the situation where the validity of administrative action standing by itself may be dubious or where ambiguities in a statute or rules are resolved by reference to administrative practice prior to reenactment of a statute; and where it does not appear that the rule or practice has been changed by the administrative agency through exercise of its continuing rulemaking power. It does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that the administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers." [7]

And again in Helvering v. Reynolds, 313 U.S. 428, 432, 61 S.Ct. 971, 973, 85 L.Ed. 1438, 134 A.L.R. 1155, the court said: " * * * Congressional reenactment of the language in question was an adoption of its previous interpretation, within the rule of such cases as United States v. Dakota-Montana Oil Co., 288 U.S. 459, 53 S.Ct. 435, 77 L.Ed. 893. That rule is no more than an aid in statutory construction. While it is useful at times in resolving statutory ambiguities, it does not mean that the prior construction has become so embedded in the law that only Congress can effect a change. * * * It gives way before changes in the prior rule or practice through exercise by the administrative

---

[3] Henderson v. United States Radiator Corporation, 10 Cir., 78 F.2d 674, 675.
[4] Cf. Commissioner v. Sunnen, 333 U.S. 591, 602-603, 68 S.Ct. 715, 92 L.Ed. 898.
[5] United States v. Dakota-Montana Oil Co., 288 U.S. 459, 466, 53 S.Ct. 435, 77 L.Ed. 893; Brewster v. Gage, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457; Helvering v. Reynolds Tobacco Co., 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536; Morgan v. Commissioner, 309 U.S. 78, 81, 60 S.Ct. 424, 84 L.Ed. 585.
[6] Sec. 130.22, supra, became effective March 31, 1942.

[7] The contention that the holdings in the Wilshire and Reynolds cases should be limited to changes made by legislative, as distinguished from interpretative regulations, is not without force. See Columbia Law Review, Vol. XL, Feb., 1940, No. 2, p. 252. But those cases make no such distinction and we think plainly hold that the administrative agency may change an interpretative regulation after the Congress has approved such regulation by reenactment of the statute without material change.

agency of its continuing rule-making power."

Here, the phrase "transportation by pipe line" is susceptible of interpretation and we do not think the construction thereof in the 1942 Regulations can be said to be a strained, artificial, or unreasonable one.

Accordingly, we conclude that the transportation from the stabilization plants to the storage tanks constituted a gathering service which was subject to the tax.

Affirmed.