**REPUBLIC OIL REFINING CO. v. GRANGER, Collector of Internal Revenue.**

Civil Action No. 8669.

United States District Court
W. D. Pennsylvania.

June 21, 1951.

C. W. Campbell, and J. Vincent Burke, Jr., of Campbell, Houck & Thomas, Pittsburgh, Pa., and Edgar J. Goodrich, and

Jerome J. Dick, Washington, D. C., for plaintiff.

Courtney C. Hamilton, Washington, D. C., and Edward C. Boyle, U. S. Atty., Pittsburgh, Pa., for defendant.

GOURLEY, Chief Judge.

This is an action by the Republic Oil Refining Company, a Texas Corporation, against Stanley Granger, Collector of Internal Revenue for the Western District of Pennsylvania, to recover for excise taxes assessed and collected under the provisions of Section 3460 of the Internal Revenue Code of 1941, c. 412, 55 Stat. 687, Secs. 502 and 521 (a) (22), and by the Revenue Act of 1942, c. 619, 56 Stat. Sec. 616, 26 U.S.C.A. § 3460 (a) and (b).

The Internal Revenue Code, as it applies to the instant case, provides:

"Transportation Of Oil By Pipe Line

"(a) Computation and payment. There shall be imposed upon all transportation of crude petroleum and liquid products thereof by pipe line—

"(1) A tax equivalent to 4 1/2 per centum of the amount paid for such transportation, to be paid by the person furnishing such transportation.

"(2) In case no charge for transportation is made, either by reason of ownership of the commodity transported or for any other reason, a tax equivalent to 4 1/2 per centum of the fair charge for such transportation, to be paid by the person furnishing such transportation.

"(3) If (other than in the case of an arm's length transaction) the payment for transportation is less than the fair charge therefor, a tax equivalent to 4 1/2 per centum of such fair charge, to be paid by the person furnishing such transportation.

"(b) Fair charge defined. For the purposes of this section, the fair charge for transportation shall be computed—

"(1) from actual bona fide rates or tariffs, or

"(2) if no such rates or tariffs exist, then on the basis of the actual bona fide rates or tariffs of other pipe lines for like services, as determined by the Commissioner, or

"(3) if no such rates or tariffs exist, then on the basis of a reasonable charge for such transportation, as determined by the Commissioner. 53 Stat. 421, as amended June 29, 1939, 10 p. m. E.S.T., c. 247, Title I, § 1, 53 Stat. 862."

Exemption provisions were added to the Internal Revenue Code: "Exempt transportation. For the purposes of this section, the term 'transportation' shall not include any movement through lines of pipe within the premises of a refinery, a bulk plant, a terminal, or a gasoline plant, if such movement is not a continuation of a taxable transportation. The crossing of rights-of-way, streets, highways, railroads, levees, or narrow bodies of water, in connection with such a movement, shall not of itself constitute such movement as being 'transportation'." 26 U.S.C.A. § 3460(c).

The old regulations issued in conjunction with Sec. 731 of the Internal Revenue Act were substantially modified and now appear as Treasury Regulations 42, Secs. 130.20 through 130.26, promulgated under the Internal Revenue Code:

"Sec. 130.20. Effective Period. The tax on the transportation of crude petroleum and liquid products thereof by pipe line was imposed originally by Title V of the Revenue Act of 1932. The applicable provisions of the Revenue Act of 1932 were superseded, effective March 1, 1939, by provisions of the Internal Revenue Code. The rate of tax was increased from 4 per cent to 4 1/2 per cent by section 1650(a), as added by section 210 of the Revenue Act of 1940, effective for a period of five years beginning July 1, 1940. The tax at such increased rate was made permanent by amendment of section 3460(a) by section 502 of the Revenue Act of 1941.

"Sec. 130.21. Scope of Tax. Section 3460, as amended by section 502 of the Revenue Act of 1941, imposes a tax on all transportation of crude petroleum and liquid products thereof by pipe line.

"The tax applies to any movement of the specified products by pipe line by any person regardless of whether the movement is for hire. The ownership of the pipe-line facilities, or of the product trans-

ported, is immaterial. The taxable pipe-line movement of the specified products includes gathering service within the producing field or area, trunk line transportation service, and loading service furnished as part of, or in connection with, a transportation service.

"Sec. 130.22 Gathering, Trunk line, and Loading services.

\* \* \* \* \* \*

"Trunk line service includes movements of the specified products from the end of gathering lines, or from unloading points such as loading racks or loading wharves, through main or trunk pipe lines to a point of delivery.

"Loading service includes the loading of the specified products into tank cars or tank vessels over loading racks or loading wharves, where such service is performed as part of, or in connection with, transportation service.

"Sec. 130.23. Liability for Tax. The tax is payable by the person furnishing the transportation service.

"Sec. 130.24. Rate and Computation of Tax. The tax is imposed at the rate of 4-1/2 per cent of the amount paid under actual bona fide rates or tariffs for transportation of crude petroleum and liquid products thereof by pipe line.

"Where no charge is made for the transportation of crude petroleum and liquid products thereof by pipe line by reason of the ownership of the commodity so transported, or for any other reason, the tax, at the rate of 4-1/2 per cent, shall be computed on the basis of a fair charge for such transportation, as determined by the Commissioner.

"In cases of other than arm's-length transactions, where the payment for transportation of crude petroleum and liquid products thereof by pipe line is less than the fair charge for such transportation, the tax at the rate of 4-1/2 per cent shall be computed on the basis of a fair charge for such transportation, as determined by the Commissioner.

"Sec. 130.25. Fair Charge. Where no actual bona fide rates or tariffs have been published to cover any particular pipe-line transportation movement of crude petrol-

eum or liquid products thereof, the Commissioner will determine what constitutes a fair charge for the purpose of this tax in respect of the particular movement under consideration, on the basis of the ordinary or customary charge for like or similar service.

"Where no ordinary or customary charge for like or similar service exists there should be submitted to the Commissioner for his guidance and assistance in determining a fair charge, (a) a full statement of the facts surrounding the particular movement; (b) a full description of the pipe-line system; and (c) a map or diagram showing in detail the particular area or field and the pipe-line facilities used, including tanks at the point of origin, along the line and at destination, loading and unloading facilities, and any other facilities used in connection with such system.

"Sec. 130.26. [as added by T.D. 5190, 1942-2 Cum. Bull. 237]. Exempt Transportation. The tax does not apply to the movement on and after November 1, 1942, of crude petroleum or liquid products thereof through lines of pipe within the premises of a refinery, a bulk plant, a terminal, or a gasoline plant, if such movement is not a continuation of a taxable transportation. For purposes of this exemption, a movement is regarded as being carried on within the premises of a refinery, bulk plant, terminal, or gasoline plant even though in connection with such a movement the pipe line through which the petroleum or liquid products thereof are carried incidentally traverse rights-of-way, streets, highways, railroads, levees or narrow bodies of water (such as creeks, canals, etc.)."

Although the parties do not agree upon the nature of the particular movements involved, and on which the tax is based, the basic facts are not in dispute.

Republic's claim is to recover $24,778.03 paid to the defendant as assessed excise taxes on the transportation of oil by pipe line for the period May 1, 1942, through January 31, 1946, in connection with movements of crude petroleum and liquid products thereof propelled by taxpayer's pumps to and from vessels at wharves or docks

and taxpayer's refinery premises at Texas City, Texas.

During the taxable periods involved, prior thereto and since, Republic was and is a Texas Corporation, doing business in that state, particularly at Texas City, Texas, but with principal offices at Pittsburgh, Pennsylvania.

As a part of its business it owned and operated a refinery and two adjacent tank farms some distance from docks and wharves owned and operated by Texas City Terminal Railway Company.

The Taxpayer's business at Texas City including dealing in and processing crude petroleum and liquid products thereof. Such products moved by pipe line to and from vessels at the docks on Galveston Bay at Texas City, to and from pumps situated on taxpayer's two tank farms near its refinery proper. The tanks on the two tank farms were used for storage and also in the processing and refining of oil. All the movements here involved were propelled by taxpayer's pumps which moved the products from vessels into taxpayer's tank farm tanks and, in reverse movements, forced products from taxpayer's tank farm tanks into the vessels.

The taxpayer's pumps were four in number and were situated at points varying from approximately 2500 feet to 4000 feet from the docks. The taxpayer's pipe lines also transversed the two loading and receiving docks used, distances of 500 feet on one and 900 feet on the other. Though the pipe lines across the docks were operated by the taxpayer, nevertheless the Texas City Terminal Railway Company charged the taxpayer for loading and unloading there in accordance with and pursuant to its published tariff.

Other movements occurred within the boundaries of the refinery properties which were not taxed and are not important in this controversy as they are conceded to have taken place wholly within the refinery premises.

## Questions Presented

I. Whether movements of crude petroleum and the liquid products thereof by pipe line between points on plaintiff's refinery property to and from vessels at docks (distances approximating 2,500 to 4,000 feet) are exempt from tax—

(a) as being movements wholly within the premises of a refinery,

(b) as being movements which constitute solely a loading operation, or

(c) as being strictly a part of the refining process as to 20 per cent of such products which are blended in the pipes.

II. Whether plaintiff's claims for refund apprised the Commissioner of facts sufficient to support a recovery on the theory that blending in the pipes is a refinery operation extending the refinery boundaries or premises through plaintiff's rights-of-way to distant wharves.

III. Whether in the event the plaintiff has overpaid the tax it can recover interest from the date plaintiff's check therefor was received by the defendant Collector, or the date the check was deposited by him.

Plaintiff contends:

1. That the described movements are not taxable because under the law of Texas, the easements appurtenant on which the lines are laid are part and parcel of plaintiff's properties; that the movements took place entirely within its own refinery premises and, therefore, are exempt under Section 3460(c).

2. That the described movements are not taxable because they accomplished merely a loading or unloading of oil and refined products, and, therefore, are exempt under Treasury Regulation 42.

The defendant contends that the incidence and payment of the tax was correct unless all the movements of crude petroleum and liquid products here involved were completed entirely "within the premises of a refinery" as that term is used in Section 3460(c) of the Internal Revenue Code, and the applicable Treasury Regulations, supra.

To aid in the understanding of our problem, I believe it will be helpful to insert a blueprint which shows with clarity the refinery, appurtenances thereto, and the docks from which the crude oil is received and shipped after treatment.

For adjoining territory see next page

For adjoining territory see next page

TERMINAL RAILWAY COMPANY

REFINING COMPANY

SID RICHARDSON
REFINING Ca

PETROL OIL & REF. Co.

For adjoining territory see next page

I. Were the movements of crude petroleum and the liquid products thereof by pipe line between points on plaintiff's refinery property to and from vessels at docks (distances approximately 2500 to 4000 feet) exempt from tax as

·(a) being movements wholly within the premises of a refinery, or did said movements constitute transportation under the Act?

The test appears to be simple and practical. The difficulty lies in its application to each particular set of circumstances as they arise from the actual production, transportation and refining of petroleum products.

The question when production and refining ceases and transportation commences is one which necessarily will vary in almost every case.

It must, therefore, be determined—Were the movements of crude oil from and to the barges, and to and about the refinery a part of the production process or part of a loading process, or were the movements similar to those activities which a pipe line carrier would ordinarily undertake and perform?

There are many court cases which consider the tax on the transportation of oil by pipe line but none considers the application of the exemption claimed here.

When Congress wrote this new subsection, 3460(c), into the Code by the 1942 Revenue Act, it did not define the term "premises." Neither the record of the Congressional Committee hearings nor the Committee reports contain any discussion which might disclose just what the Congress intended.

The term "premises" furthermore has not been judicially defined as it applies to the exemption of 3460(c) so that our problem becomes one of first impression.

In view of this most interesting and important involvement, the Court will be somewhat extensive in disposing of the question.

■■■ Under these circumstances the definition of the term "premises" is dependent upon the local law—the law of Texas—as it is well settled that the local rule will be followed whenever the application of a Federal revenue statute is dependent upon fact which can be interpreted only in accordance with state rules of property. Magruder v. Supplee, 316 U.S. 394, 62 S.Ct. 1162, 86 L.Ed. 1555; Stuart v. Helvering, 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154; Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876.

■■■ It is essential, therefore, to determine the law of Texas, as contained in the statutes or as defined by the decisions of the Court of that State, and of such statutes and decisions this Court has judicial notice.

In order to appreciate the nature of Republic's property interest in the land area concerned, reference to the history of its acquisition is essential.

In 1904 a concern which was the predecessor of the Texas City Terminal Railway Company, hereinafter called Terminal (the grantor and/or lessor of all of Republic Refinery premises) acquired twelve hundred acres of land, which now comprises the entire industrial area of Texas City. The industrial development of Texas City began that same year when deep water was brought to the area by the dredging of a ship channel. As shown by the appended blueprint, however, there were and are only three slips, or docks, so that the developers could not permit heavy industry to occupy the shoreline, and thus shut off plants in the rear areas from use of water transportation. Accordingly, from the beginning, both Terminal and its predecessor adopted the invariable practice of reserving the right to grant easements appurtenant leading to the water front across any granted or leased property. Consequently, when Terminal leased or conveyed lands away from the docks, it could, at the same time, grant easements to the docks across its intervening land, thereby preserving the correlative rights of all the industries in the area.

The first oil refinery in Texas City was built in 1908; the second was the Republic Refinery, built in 1931; Pan American's refinery was constructed in 1933; and two others have been erected since

that time. The protection of the correlative rights of all the industries in Texas City to reach the docks and the deep water area for loading and unloading various commodities have been preserved in each and all of the deeds and leases.

Plaintiff first went into possession of the properties on which it established its refinery under a thirty-year lease, dated April 1, 1931, from Terminal. The area covered by this document is often described as the "main" refinery tract and includes the North and West Tank Farms. The lease also granted easements appurtenant to this tract over Terminal's property as follows: "Lessor leases to lessee on easement of right of way over property between the leased property and an oil dock at shipside, for a pipe line or lines, with the right to erect such appliances on the dock as shall be necessary for the conduct of lessee's business, together with an easement of right-of-way over lessor's property for such other pipe lines, wagon roads or other such requisite adjuncts as are necessary to the business of lessee, to and from the above described tract."

Pursuant to its rights under the easements, Republic installed its pipe lines extending from the refinery tract to and over the docks. Since installation of these lines in 1931, no person or concern has ever questioned or contested plaintiff's right to this easement appurtenant and to its exclusive use for its own lines. The movements of oil through these lines are the only movements involved in this case.

Republic was required to pay a rental of six per centum of the total value of the premises for the use of the tract and the easements appurtenant thereto. In addition, Republic was obligated to pay all taxes, governmental levies, and assessments upon the leased premises. No claim for taxes or any other assessment has ever been made by any governmental authority against the owner of the ground which was under lease.

Finally, said lease gave plaintiff an option to purchase the leased premises which included the easements appurtenant thereto. This option plaintiff duly exercised, and the property was conveyed to plaintiff by Terminal by deed dated June 21, 1940.

This grant of easement was amended by deed dated September 28, 1940 to provide that the easement appurtenance could be used to transport oil only across docks owned by Terminal.

By virtue of the lease of April 1, 1931, and the deed of June 21, 1940, Republic acquired the so-called "main" Refinery Tract including the North and West Tank Farms, together with all the easements appurtenant thereto running from the tracts to the docks. There has been an open and uncontested adverse use of these easements by plaintiff since 1931, which use has never been questioned. The movements of oil involved in this case are the movements over the above easements.

The "South Farm" was acquired by assignment of the 1921 lease in 1940, which lease has been extended to 1971. The Southport Republic tract is held under lease by a subsidiary of Republic and was subleased to Republic by the subsidiary in 1940.

As owner, and as lessee, plaintiff pays all taxes against the properties it owns and leases, and under the Texas Taxation Statutes the evaluation of the easements appurtenant must be included in the assessment of the ad valorem tax.

"Premises" is not a word easily defined. It has different connotations when applied to different situations. The intention of the Congress in using the word "premises" in this Act is a prime factor in its construction. It cannot be doubted that one of the intentions was to raise revenues for the government, and, it is believed, the use of the term "within the premises" was intended to have a practical, common sense application in determining the extent of the movement exempted from the tax.

■■ In construing an exemption provision the court must consider the whole statute and objects and purposes of the law as indicated by its various provisions and give the statute such a construction as will carry out the true intent and meaning of Congress. The literal meaning of

words will be sacrificed if necessary in order that the purpose may not fail. A thing which is within the letter of the statute is not within the statute, unless it is within the intention of the law makers. Helvering v. N. Y. Trust Co., 292 U.S. 455, 464–465, 54 S.Ct. 806, 78 L.Ed. 1361.

Exemption from taxation being an exercise of legislative grace is not presumed and is not to be extended by implication. United States v. Stewart, 311 U.S. 60, 71, 61 S.Ct. 102, 85 L.Ed. 40; Helvering v. Northwest Steel Mills, 311 U.S. 46, 49; Trotter v. State of Tennessee, 290 U.S. 354, 356, 54 S.Ct. 138, 78 L. Ed. 358.

Exempting statutes are strictly construed against the taxpayer and doubt that the exemption is clearly applicable is fatal to the claim. Cornell v. Coyne, 192 U.S. 418, 431, 24 S.Ct. 383, 48 L.Ed. 504; Heiner v. Colonial Trust Co., 275 U.S. 232, 235, 48 S.Ct. 65, 72 L.Ed. 256.

It is well established that, under the law of Texas, an easement appurtenant, as distinguished from an easement not appurtenant (commonly referred to as "easement in gross") is an interest in land and an inherent part of the premises to which it is appurtenant. Latimer v. Hess, Tex.Civ.App., 183 S.W.2d 996; Pokorny v. Yudin, Tex.Civ.App., 188 S.W.2d 185.

The easements in question conform to the requisites of easements appurtenant in that they exist for the benefit of a particular tract, Alley v. Carleton, 29 Tex. 74, 77; they are across adjoining land, Alley v. Carleton, supra; they benefit the dominant tenement, Stuart v. Larrabee, Tex. Civ.App., 14 S.W.2d 316.

Such easements pass with the conveyance of the land to which they are appurtenant even though not specifically mentioned in the deed. 28 C.J.S., Easements, § 46, p. 709, fn. 10.

An easement appurtenant is so clearly a part of the land that it is generally held to be incapable of existing apart from the land to which it is appurtenant; it is a covenant running with the land. 28 C.J.S., Easements, § 4, p. 634.

Since the plaintiff's title to these easements and the land to which they are appurtenant were acquired from a single grantor in a single conveyance, and since they are an inherent part of the land conveyed, it is my considered judgment that under the law of Texas the said easements are part of the "premises."

I. Were the movements of crude petroleum and the liquid products thereof by pipe line between points on plaintiff's refinery property to and from vessels at docks (distances approximately 2500 to 4000 feet) exempt from tax as

(b) being movements which constitute solely a loading operation?

Simple loading service is exempted unless furnished as a part of, or in connection with, a transportation service.

In order to determine the nature of these movements, I believe it would be helpful to trace briefly the history of Section 3460 in order to point up the substantial liberalization of the prior law by the addition of the specific exemptions granted by the new sub-section (c) of Section 3460, and in the Regulations promulgated after its enactment in the Revenue Act of 1942.

A tax on the transportation of petroleum products by pipe line was originally imposed by Section 731 of the Revenue Act of 1932, which was substantially re-enacted as Sections 3460(a) and (b) of the Internal Revenue Code. No specific exemption was contained in the law until Section 3460(c) was enacted in 1942 and the new regulations promulgated. The Regulations originally issued in conjunction with Section 731 have been substantially modified, Continental Oil Co. v. Jones, 10 Cir., 176 F.2d 519; and now appear as Regulations 42, Sections 130.20 through 130.26.

Under Section 731 of the Revenue Act of 1932 and the Regulations thereunder, the courts generally held that a loading and unloading service was taxable because the movement was of a type which pipe line carriers undertook. McKeever v. Fontenot, 5 Cir., 104 F.2d 326; Magnolia Petroleum Co. v. U. S., 53 F.Supp. 231, 101 Ct.Cl. 1.

In other words, so long as the movement was incidental to the process of producing

or refining oil, there was no tax; but a tax would attach if the movement was substantially similar to movements which pipe line carriers usually undertake and perform. This test was held to govern regardless of the type of movement involved, whether a gathering, transporting or loading service, as those processes were separately defined in the Regulations.

With the addition of subsection (c) of Section 3460 to the Code, the Regulations have been completely rewritten, and the governing requirements have assumed an entirely new and different meaning. Continental Oil Co. v. Jones, supra.

The new Regulations dropped the old test; they contain no reference to the former test of whether pipe line carriers usually performed the type of movement involved. Instead, both the Code and the Regulations now specifically define each type of taxable movement and imposition of the tax is simply a matter of fitting the movement involved within one or more of the applicable definitions.

Section 3460(c) expressly exempts from its term "transportation" "any movement through lines of pipe within the premises * * * if such movement is not a continuation of a taxable transportation."

Section 130.21 of the new Regulations 42 defines "the taxable pipe line movement" as including "gathering service within the producing field or area, trunk line service, and loading service furnished as part of, or in connection with, a transportation service."

*Taxable* loading service is, in turn, defined by Section 130.22, as "the loading of the specified products into * * * tank vessels * * * where such service is performed *as part of,* or in *connection with, a transportation service.*" (Emphasis supplied.)

Thus, the Regulations make it clear that loading or unloading by and of itself is not taxable. The tax attaches *only* if that work is part of, or in connection with, a taxable transportation of oil by pipe line.

The sole question then is whether or not the loading operations conducted by Republic through its own lines are in connection with a taxable *transportation pipe line service.*

The statute, Section 3460(a), Internal Revenue Code, first imposes a tax upon "all" transportation of crude petroleum and liquid products thereof by pipe line to be paid by the person furnishing such transportation. By subsection (c) thereof Congress then defined exempt transportation, the pertinent parts of which include " * * * the term 'transportation' shall not include any movement through lines of pipe within the premises of a refinery, * * *."

Treasury Regulations 42, Section 130.21, applies the tax regardless of the ownership of the pipe line, the oil or the facilities used.

The word "transportation" is not a term of art, but one in common use and its meaning can be simply defined (as its etymology would indicate) as a movement of things or persons from one place to another. The following authorities define the word:

Century Dictionary and Cyclopedia:

1. The act of transporting, or conveying from one place to another, or the state of being so transported; carriage; conveyance; transmission.

Funk and Wagnalls, New Standard Dictionary of the English Language:

1. The act of transporting, or the state being transported; conveyance; carriage of persons or commodities from one place to another.

Webster's International Dictionary:

1. The act of transporting, or the state of being transported; carriage from one place to another; removal; conveyance.

The Supreme Court has defined the word accordingly. Thus, in Gloucester Ferry Co. v. Com. of Pennsylvania, 114 U.S. 196, at page 203, 5 S.Ct. 826, at page 828, 29 L.Ed. 158, the Court said: "Transportation implies the taking up of persons or property at some point and putting them down at another."

Prior to the loading of products the only movements here are the various movements during the refining process, between tanks, stills and other installations entirely within taxpayer's premises: these, defendant concedes, are not taxable because expressly ex-

cluded from qualifying as "transportation service" by Section 3460(c).

It is likewise admitted that when the loading movement ended in the tanker there was no transportation service at the dock of which it could be a part, or with which it could be connected. The same facts obtain as to the reverse movement of loading the refinery tanks by unloading the vessels.

The evidence has established the usages of the industry to be as follows:

That if the refinery is located within a distance up to about two miles from the docks so that the refinery itself can carry on and control the loading and blending in its own lines and deliver directly to the vessel (and vice versa), that, in the industry, is a mere loading operation—not transportation.

That if the distance is greater than about two miles, the products cannot be loaded directly from refinery to vessel (or vice versa) because of lack of proper controls and other physical and mechanical difficulties, and increased hazards. Under those conditions, it is necessary to set up shore tanks to which delivery of the products would be made, and from which the vessels would be loaded (and vice versa). The movements both ways between the shore tanks, which establish a terminal, and the refinery, the industry recognizes as transportation—and that would be taxable. Also taxable would be the loading of the vessels from the shore tanks (and vice versa) for that would be a loading service furnished as part of, or in connection with, a transportation service.

That is not the situation in this case, and the contrast between that situation and Republic's direct loading operations serves to outline the Congressional intent in writing Section 3460(c) into the law, which intent the Commissioner obeyed in rewriting and liberalizing his Regulations.

It should be remembered that the transportation of oil of itself is not taxable. Congress imposed a tax on the movement of oil by pipe line under specified circumstances. Clearly, the loading operation, as carried on by plaintiff at its compact plant, with its first tank only 1500 feet from dock-side, making delivery directly from refinery to tanker (and vice versa) is not one of those circumstances, because the loading is not a part of nor connected with a transportation service.

It is my judgment that Congress, by writing subsection (c) into the law, intended to exempt a movement of the type here involved.

I. Were the movements of crude petroleum and the liquid products thereof by pipe line between points on plaintiff's refinery property to and from vessels at docks (distances approximately 2500 to 4000 feet) exempt from tax as

(c) being strictly a part of the refining process as to 20 per cent of such products which are blended in the pipes?

II. Did Republic's claim for refund apprise the Commissioner of facts sufficient to support a recovery on the theory that blending in the pipes is a refinery operation extending the refinery boundaries or premises through Republic's rights-of-way to distant wharves?

In view of the close inter-relation between the questions presented in I(c) and II, the same will be considered together.

Section 3772(a), Internal Revenue Code, 26 U.S.C.A. § 3772(a), and Section 29.322–3 of Treasury Regulations 111, provide, inter alia, that the claim must set forth in detail each ground thereof and facts sufficient to apprise the Commissioner of the "exact basis" thereof. A failure to so apprise the Commissioner is fatal to the claim on any basis omitted unless waived by the Commissioner. There is no waiver here.

The effective administration of these modern complicated revenue measures inescapably leads Congress to authorize detailed administrative regulations by the Commissioner of Internal Revenue. He may insist upon full compliance with his regulations. Angelus Milling Co. v. Commissioner, 325 U.S. 293, 296, 299, 65 S.Ct. 1162, 89 L.Ed. 1619.

Plaintiff's claims for refund are made exhibits to the complaint. No mention or intimation therein is made of plaintiff's contention that blending in the pipes leading between refinery points and vessels was to

be considered as extending plaintiff's refinery premises to vessels at the loading wharves. No such issue was set forth in the complaint in so many words.

If the government desired to be informed in more detail as to what the plaintiff would prove to establish that movements of oil were within the premises of the plaintiff, said information could have been secured prior to trial by depositions, interrogatories or discovery through the Federal Rules of Civil Procedure, 28 U.S.C.A.

Furthermore, although the government objected to the testimony relative to blending being done in the lines between the dock and parts of the refinery, no request was made for continuance.

If plaintiff had asked leave to amend its complaint, the Court would have so allowed.

 Where evidence is objected to at the trial because not within the issues made by the pleadings, amendments generally are allowed with great liberality. Newman v. Zinn, 3 Cir., 164 F.2d 558.

Plaintiff's claims for refund specifically stated that one of the bases for claiming the tax exemption was that the movements of oil involved were within plaintiff's premises.

I do not believe the amendment was necessary and the evidence as to refining in the lines was proper.

About 20 per cent of plaintiff's products is blended in moving from its pumps, manifolds and storage tanks within the refinery boundaries to vessels at the wharves and also blending takes place in the reverse movement. The plaintiff claims, therefore, (a) that for the purposes of this tax the refinery premises extend beyond the refinery boundary on to and over its rights-of-way to the point where the actual loading of the vessels is accomplished, and (b) that the blending between refinery points and vessels is really, truly and strictly a part of its refinery processing of oil and its liquid products, hence, is refining or a loading service and not transportation within the meaning of Section 3460(c), Internal Revenue Code and, therefore, intended by the Congress to be exempt.

The defendant seeks to dismiss the operation of blending as being immaterial to the determination of what constitutes "premises" in that the Fifth Circuit Court of Appeals has declared that blending is essentially different from refining, for, in the latter, the different grades of petroleum products which are found mixed together in nature are separated and placed in separate storage. In blending the reverse is true, different grades being mixed again to form a usable or desirable combination. McKeever v. Fontenot, supra.

In the course of trial, I posed these specific conclusions of the Fifth Circuit Court of Appeals to expert witnesses, whose reputation and experience in the oil industry were conclusively established, and they inalterably rejected this view as erroneous, and held that, to the contrary, blending is a distinct and integral part of the refining process and universally recognized as such among refining engineers.

 In view of the testimony, I am compelled to conclude that blending is an adjunct of the refining process. That since said pipe lines from the wharves to the tanks are employed approximately twenty per centum of the time to effectuate such blending, this fact is evidence that the pipe lines are part of the refining apparatus and, therefore, a part of the "premises."

Nevertheless, in the event I am mistaken in the admission of this evidence for failure of plaintiff to specifically set forth such issue in its complaint, I would in no way be inclined to alter the conclusion I have reached. At most, this matter is evidentiary and merely helps to buttress the case which the plaintiff has already established.

 In a trial to the court without a jury, the admission of improper evidence cannot be said to be prejudicial error if there is competent evidence to sustain the findings of the court. Rokey v. Day & Zimmermann, Inc., 8 Cir., 157 F.2d 734, certiorari denied 330 U.S. 842, 67 S.Ct. 1082, 91 L.Ed. 1288, review denied 331 U.S. 864, 67 S.Ct. 1198, 91 L.Ed. 1869.

III. If the plaintiff has overpaid the tax, is he entitled to recover interest from the

date plaintiff's check was received by the Collector, or the date the check was deposited by him?

In the initial pleadings defendant had contended that if Republic were allowed to recover in this proceeding, interest should be computed from the date that Republic's check was deposited rather than from the date it was received.

Section 3771 of the Internal Revenue Code, 26 U.S.C.A. § 3771, provides:

"(a) Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the rate of 6 per centum per annum.

"(b) Such interest shall be allowed and paid as follows:

\* \* \* \* \* \*

"(2) In the case of a refund, from the *date of the overpayment* \* \* \*." (Emphasis supplied.)

Section 3656(a) of the Internal Revenue Code, 26 U.S.C.A. § 3656(a), authorizes the collector to receive checks drawn on national and state banks and trust companies in payment of internal revenue taxes. The Regulation, 52 App. to Regulation 111, provides: "The day on which the collector receives the check will be considered the date of payment, so far as the taxpayer is concerned, unless the check is returned dishonored (this was made applicable to the Internal Revenue Code by Treasury Decision 4885, approved February 11, 1939)."

In view of the foregoing, it appears that interest should be computed as of the date of receipt of the check, June 11, 1948.

### Conclusion

The movements of oil by pipe line involved in this proceeding are exempt from taxation and plaintiff is entitled to recover the sum of $23,495.35, together with statutory interest thereon from June 11, 1948.

### Findings of Fact

1. Plaintiff is a Texas Corporation with its principal offices at Pittsburgh, Pennsylvania.

2. Defendant is and has been the duly appointed and authorized Collector of Internal Revenue for the 23rd District in the Commonwealth of Pennsylvania since January 1, 1943, with his offices located in Pittsburgh, Pennsylvania.

3. Southport Republic Terminal Company is a Texas Corporation with an office in Houston, Texas. Plaintiff owns fifty (50) percent of the capital stock of this company.

4. Texas City Terminal Railway Company is a Texas Corporation with an office in Texas City, Texas.

5. Defendant sent plaintiff a Notice of Assessment dated the 14th day of June 1946 levying a tax, purportedly pursuant to Section 3460 of the Internal Revenue Code, of $44,016.39, representing tax and accrued interest up to May 27, 1946. This was stated to be a tax on the transportation of oil by pipe line at plaintiff's Texas City refinery for the period from May 1, 1942 to January 31, 1946, inclusive.

6. Plaintiff duly filed an Abatement of Tax Assessed dated June 24, 1946, and by Notice of Adjustment for Claim for Abatement dated May 25, 1948, signed by D. S. Bliss, Deputy Commissioner, plaintiff was notified that part of said claim in the amount of $22,292.81, consisting of $20,055.23, representing the transportation of oil by pipe line tax, plus $2,237.58 accrued interest as of May 27, 1940, had been rejected.

7. On the 11th day of June 1948, plaintiff paid to the defendant said sum of $22,292.81. In addition, the defendant credited the amount of $2,485.22, which was a refund of interest due plaintiff on overpayment of its 1943 income tax liability, against the accrued interest due as of June 11, 1948, on the said assessment of $20,055.23. Accordingly, the defendant collected from the plaintiff the sum of $20,055.23 as tax on transportation of oil by pipe line, plus accrued interest as of June 11, 1948, in the amount of $4,722.80, or a total of $24,778.03.

8. The amount claimed as due to plaintiff in this action is the sum of $18,971.51 plus accrued interest in the amount of $4,523.84 or a total claim of $23,495.35, with interest thereon from June 11, 1948.

9. A check in payment of said tax and interest referred to in No. 7 above was mailed on June 11, 1948, during the ordinary course of business and was received by the defendant on June 11, 1948. Defendant did not deposit said check until June 24, 1948.

10. On the 19th day of November 1948 plaintiff duly filed a timely claim for refund with defendant at his office in Pittsburgh, Pennsylvania. On the 25th day of August 1949 plaintiff duly filed a timely amended claim for refund.

11. By letters dated February 17, 1949 and October 6, 1949, the Commissioner of Internal Revenue notified plaintiff of the disallowance of its original and amended claims for refund. Thereafter this suit was timely brought.

12. Plaintiff operates a crude oil refinery at Texas City, Texas.

13. The industrial development of Texas City began in 1904, when deep water was brought to the city by the dredging of the Texas City ship channel. In 1904 the predecessor of the Texas City Terminal Railway Company, hereinafter called Terminal, the grantor and/or lessor of all of Republic's refinery premises, acquired 1200 acres of land, which now comprises the entire industrial area of Texas City. At waterside there were (and are) only three docking spaces so that it was impossible for the company to bring every industry in the area to the shore line. Since 1904 Terminal and its predecessor made it a strict policy and practice to reserve the right to grant easements appurtenant across any granted or leased property. The preservation of correlative rights of all the industries in Texas City to reach the docks and the deep water area for loading and unloading various commodities thus have been preserved in each and all of that company's deeds and leases.

14. The first oil refinery in Texas City was built in 1908; the second was plaintiff's refinery, which was built in 1931; Pan American's refinery was constructed in 1933; and two others have been erected since that time.

15. Plaintiff's refinery premises consist of the "main" refinery tract, which includes the North and West tank farms, the major portion of the Southport Republic tract, the South tank farm and the easements appurtenant extending from these properties to and onto the docks.

16. Plaintiff went into possession of the "main" refinery tract and the North and West tank farms and the easements appurtenant extending from these properties to and onto the docks under a thirty (30) year lease dated April 1, 1931, from Texas City Terminal Railway Company. The same lease granted to plaintiff easements appurtenant to the leased tracts, as follows: "Lessor leases to lessee an easement of right of way over property between the leased property and an oil dock at shipside, for a pipe line or lines, with the right to erect such appliances on the dock as shall be necessary for the conduct of lessee's business, together with an easement of right-of-way over lessor's property for such other pipe lines, wagon roads or other such requisite adjuncts as are necessary to the business of lessee, to and from the above described tract."

17. Pipe lines were laid and installed by plaintiff in 1931 along and over the granted easements appurtenant extending from the leased property to and over the docks. Since the installation of the lines, no person or concern has ever contested plaintiff's ownership of the easement or its right to use, maintain and control the lines laid thereon.

18. The plaintiff was required to pay an annual rental of six per centum of the total value of the leased properties, including the easements appurtenant thereto. In addition, Republic was obligated to pay all taxes, governmental levies and assessments upon the leased premises and no claim has ever been made by a governmental authority for taxes or any other assessment against the owner of the ground which was under lease. Said lease gave the plaintiff an option to purchase the leased properties, including the easements appurtenant thereto.

19. The plaintiff duly exercised the option to purchase, contained in the lease, and the properties, including the easements appurtenant, were conveyed to plaintiff by Terminal by deed dated June 21, 1940. The easement clause contained in said deed was amended by deed dated September 28, 1940, to provide that the easements appurtenant could be used to transport oil only across docks owned by Terminal.

20. Republic acquired its interest to that part of its refinery premises known as the Southport Republic tract as follows:

(a) By deed dated January 1, 1923 Terminal leased one-half of the Southport Republic tract to E. W. Marland, together with easements appurtenant thereto, running from the tract to and over the docks. This lease was assigned to Marland Refining Company. The remaining portion of the Southport Republic tract with easements appurtenant thereto running from the tract to and over the docks was leased by Terminal to Marland Refining Company on July 1, 1924. Marland Refining Company then released six small portions of the tract at the eastern end. After these releases were executed, Marland Refining Company held the Southport Republic tract which goes East to the heavy black line in the appended blueprint.

(b) The leases of this tract with its easements appurtenant were then assigned by Marland Refining Company to Continental Oil Company.

(c) By assignment dated December 30, 1942, the leases of Southport Republic tract, with easements appurtenant thereto running from the tract to and over the docks, were assigned by Continental Oil Company to Southport Republic Terminal Company. The Southport Republic Terminal Company is a subsidiary of the plaintiff, Republic owning fifty per centum of that company's stock. These leases were to expire on April 20, 1951, but have been extended to January 1, 1973. Under paragraph four of the leases, the lessee is required to pay rent and all taxes and other governmental assessments on all the property leased and has done so.

(d) The portion of the Southport Republic tract was subleased by Republic's subsidiary to Republic by sublease, which terminates April 10, 1951. The property subleased was enlarged by other subleases on December 30, 1947.

21. Another portion of Republic's refinery premises is known as the Republic South Farm tract, which includes tanks numbered 101, 102, 103, and 104. This tract and the easements appurtenant thereto running to and over the docks was leased by Bennett Petroleum Corporation from Terminal on April 20, 1921, and in 1931 this lease was assigned by Bennett Petroleum Corporation to plaintiff. The lease was to expire April 20, 1951, but has been extended to 1971 by agreement dated June 12, 1940. Under paragraph four of the lease, Republic is required to pay rent and all taxes and assessments on all the property leased, including the easements appurtenant, and has done so.

22. All taxes on the plaintiff's refinery properties are paid by plaintiff, either as lessee or owner. The easements acquired from the same grantor, first by lease in 1931 and then by deed in 1940. Through the lines installed on these easements appurtenant are passed all the crude oil unloaded from tankers into the tanks and all the finished products loaded into tankers from plaintiff's refinery operation. These easements and the lines thereon have been used openly and notoriously by plaintiff since they were acquired; and no one has ever contested or questioned Republic's rights in the easements nor its exclusive use thereof.

23. Under Texas law the easements are easements appurtenant which are an interest in the land and are under the complete domination and control of the plaintiff. No person or concern can interfere or have interfered with these easements.

24. The easternmost boundary of the tracts under lease by plaintiff is approximately 1500 feet from the docks. The easternmost boundary of the Southport Republic tract (plaintiff's subsidiary) is about 505 feet from the docks.

25. The plaintiff manufactures at its refinery a full range of petroleum products, except lubricating oil, including premium and regular gasoline, kerosene, fuel oil and solvents. These products are produced through a series of operations usually beginning with topping, which is the preliminary fractionization of, or separation of, the various components of crude oil. Another step in the refining process is the catalytic cracking of gas oils into high octane gasoline. Another is the thermal cracking of gas oil into gasoline, which is accomplished by heat and pressure. Republic also operates a polymerization unit for the manufacture of high octane blending gasoline. Another phase of the refining operation is the blending of distillates of fuel oils to meet certain specifications as required by the customers.

26. Blending is a distinct and inherent step in the refining process.

27. The movement of the oil by pipe line as it is transferred from tank to tank, and the movement of the crude oil from freight cars into tanks, and the movements of the finished products from tanks into freight cars are not involved in this case since the defendant has conceded that these movements are not taxable.

28. The only movement of oil by pipe line involved in this case is the movement of the crude oil, over the easements appurtenant, from tankers through lines installed across the easements appurtenant to the tanks, and the movement of finished products from tanks through these same lines to the tankers. These lines are an integral part of plaintiff's plant installations and the movements through these lines are incidental and necessary to the operation of the refinery and are not such as are usually performed by a pipe line carrier company.

29. The loading of the tanks on plaintiff's refinery premises is accomplished as follows:

When a tanker loaded with crude oil comes into the slip and ties up at the dock, suitable connections are made by hose to plaintiff's pipe lines on the dock. By means of pumps aboard the tanker, the crude oil is pumped through the pipe lines installed on the easements appurtenant, into the crude storage and blending tanks.

Approximately twenty per centum of the time plaintiff will have more than one grade of crude oil coming in at the same time, and it will be necessary to blend for a suitable charge stock for the refinery. Accordingly, Republic will pump two or more of these crudes into the same line and into the tanks. The crude is then transferred through the use of pumps for other refining procedures to other parts of the refinery.

30. After various refining operations the products are pumped into tanks for further blending or storage. When tankers are to be loaded the products are pumped out through the loading lines, which are installed on plaintiff's easements appurtenant and into the tankers. About twenty per cent of the time two or more different products will be put into the loading line in suitable quantities and blended there so that when the finished product ends in the tanker, it will meet the specifications required by the customer.

31. It is scientifically impossible to ascertain when blending actually starts or ends. However, the loading lines of plaintiff, which are 1500 feet from the docks to its nearest tank, are long enough to allow the blending to take place.

32. The loading lines which run over the easements appurtenant to the tankers are wholly owned, are under the complete control of Republic and used by it exclusively. Republic has a so-called "light oil" department which handles the transfer of all oils and products and has men stationed at the docks at all times. The repair and maintenance of these loading lines is done by Republic through its engineering and inspection departments. Republic's plant manager is responsible for the maintenance and operation of these lines, as he is for all other plant facilities and installations.

33. According to the usages, practice and parlance of the petroleum industry, the movement of the crude oil over the loading

lines to the blending tanks is not considered transportation, but is purely a loading operation; and likewise the movement of the finished products from the blending tanks to the tankers over the loading lines is not transportation, but purely a loading operation.

34. Prior to the loading of the products into the tankers, the only movements of oil are the various movements during the refining process, between tanks, stills and other installations entirely within plaintiff's premises: these, defendant concedes, are not taxable because expressly excluded from qualifying as "transportation service" by Section 3460(c). Prior to the unloading from the tankers into the tanks on the refinery premises, there is no taxable pipe line transportation service as defined by Section 3460; this defendant also concedes.

35. In order to carry on loading operation similar to the operation involved in this case, the tanks of the refinery could only be a mile or two from the docks because at any greater distance the refinery would lose control of the loading operation; there would be improper coordination; and the safety of the operation would be impaired.

36. Loading operations as performed by a pipe line carrier company differ greatly from those conducted by Republic through its own lines. In such case a refinery employing the service of a carrier company meters its products and pumps them into the lines of the carrier company. These lines extend to the carrier company's waterside tract where it has erected its shore tanks. The products are stored in these tanks and from there, as required, are loaded into tankers.

Delivery of crude oil to a refinery employing the services of a carrier company would be accomplished by the reverse of the route just described.

37. Of all the refineries in the five States of the Southwestern area, Southwestern Oil and Refining Company, Maritime Oil Company, and Atlantic Refining Company are the only three that employ pipe line carrier companies to deliver crude oil to them and carry away their products.

Two of these are shut off from the water front by intervening lands owned by the carrier or terminal companies. Perforce, if these refineries wish to receive and ship by water, they must employ the carrier companies to transport the oil and products through the latter's lines, across the latter's property, to be stored in and loaded from the latter's tanks.

The third refinery uses an affiliated carrier company, with the result that (a) income is divided between them, and (b) the same management is in control of the entire operation.

38. The loading operations as conducted by Republic through its own lines could not be carried out by employment of an outside pipe line carrier company because:

(1) The integrated operation of the refinery, of which loading is a part, would be lost.

(2) The refinery would have no control of the pipe line company's employees who would be working on the refinery premises.

(3) The safety factor, so important in oil refineries, would be threatened.

(4) Necessary security measures could not be enforced.

(5) The refinery itself is responsible for the loading and unloading of its products and for metering the quantities delivered and received, and

(6) The refinery could not carry on its blending operations in its loading lines unless they are under its own constant supervision and operation.

Conclusions of Law

1. This is a suit involving the construction of Section 3460 of the Internal Revenue Code and the regulations issued thereunder, and is a suit arising under the internal revenue laws of the United States of America. Therefore, the District Court of the United States for the Western District of Pennsylvania has jurisdiction of this action pursuant to Title 28, U.S.Code, § 1340.

2. The definition of the term "premises" as contained in Section 3460(c) was not defined by Congress, and accordingly, the def-

inition of that term is dependent upon the Texas law.

3. Under the Texas law plaintiff was granted easements appurtenant to the adjoining refinery properties by the lease dated April 1, 1931, and the deed dated June 21, 1940, from Texas City Terminal Railway Company. The loading lines are installed on said easements appurtenant which easements are an interest in land and are an inherent part of the premises to which they are appurtenant. Since the easements appurtenant under the Texas law are part and parcel of the plaintiff's refinery premises, these premises extend to and onto the docks. Under Section 3460 (c), therefore, the movements of oil over these easements appurtenant are within the premises of the refinery and exempt from taxation.

4. The movement of the oil over the loading lines from the tankers to the tanks and the movement of the finished products from the tanks to the tankers under the usages and parlance of the oil industry is not transportation but is purely a loading movement not in connection with taxable transportation of oil by pipe line and are, therefore, exempt from tax under Treasury Regulation 42, Sections 130.21 and 130.22.

5. The loading lines are an integral part of plaintiff's plant installations and their use is incidental and necessary to the operation of plaintiff's refinery.

6. The interest allowed by Section 3771 of the Internal Revenue Code upon overpayments in respect of any internal revenue tax is computed at the rate of six per centum per annum and commences from the date the check is received by the Collector of Internal Revenue.

7. The assessment of the transportation of oil by pipe line taxes made by the Commissioner is erroneous, and the collection thereof by the defendant is illegal and void.

8. Plaintiff is entitled to judgment against the defendant in the amount of $23,-495.35 with interest thereon from June 11, 1948.

An appropriate Order is entered.