## LATHAM PARK MANOR, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

## LINDLEY PARK MANOR, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2339–76, 2340–76.    Filed November 9, 1977.

*Marion G. Follin III*, for the petitioners.
*Gary F. Walker*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to the tax pursuant to section 6651(a)(1):[1]

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

*Latham Park Manor, Inc.—docket No. 2339–76*

| Year ended June 30— | Deficiency | Addition to tax sec. 6651(a)(1) |
|---|---|---|
| 1969 | $7,812.87 | $390.64 |
| 1970 | 10,046.77 | 2,511.69 |
| 1972 | 14,232.10 | 3,558.03 |

*Lindley Park Manor, Inc.—docket No. 2340–76*

| Calendar year | Deficiency | Addition to tax sec. 6651(a)(1) |
|---|---|---|
| 1969 | $21,183.07 | $3,177.46 |
| 1970 | 17,005.72 | 1,700.57 |
| 1972 | 14,443.84 | 722.19 |

Due to concessions by both parties in these consolidated cases, the issues remaining for decision are as follows:

(1) Whether the Commissioner is authorized pursuant to section 482 and the regulations promulgated thereunder to allocate interest income to petitioners for interest-free loans they made to their parent corporation, Mortgage Investment Corp., irrespective of whether the proceeds of such loans generated income to the parent corporation during the taxable years in issue.

(2) Whether petitioners are entitled under section 1.482–1(d)(3), Income Tax Regs., to a setoff against the Commissioner's section 482 interest income allocations for Mortgage Investment Corp.'s guarantee of the loans to petitioners.

(3) Whether petitioners are entitled under section 162 to deduct management fee expenses in excess of the amounts allowed by the Commissioner for the years in issue.

(4) Whether the Commissioner properly determined delinquency penalties under section 6651(a)(1) against both petitioners for the years in issue.

## FINDINGS OF FACT

### 1. *General*

Petitioner Latham Park Manor, Inc. (hereinafter petitioner or Latham), is a corporation whose principal office was in Greensboro, N.C., when its petition was filed. Latham filed Federal corporate income tax returns for the fiscal years ended June 30, 1969, June 30, 1970, and June 30, 1971, with the Internal

Revenue Service Center, Chamblee, Ga.; its return for the fiscal year ended June 30, 1972, was filed with the Internal Revenue Service Center, Memphis, Tenn. Latham filed its returns on an accrual basis of accounting.

Petitioner Lindley Park Manor, Inc. (hereinafter petitioner or Lindley), is a corporation whose principal office was in Greensboro, N.C., when its petition was filed. Lindley filed its Federal corporate income tax returns for 1969, 1970, and 1971 with the Internal Revenue Service Center, Chamblee, Ga.; its return for 1972 was filed with the Internal Revenue Service Center, Memphis, Tenn. Lindley filed its returns on an accrual basis of accounting.

A third corporation, Mortgage Investment Corp. (hereinafter MIC), has its principal office in Greensboro, N.C. MIC filed its Federal corporate income tax returns on an accrual basis of accounting and used the fiscal year ending April 30. All three corporations share the same business office in Greensboro.

Latham's sole asset was an apartment complex in Greensboro consisting of 140 rental units located in about 30 buildings on approximately 15 acres of land. Lindley's sole asset was a separate apartment complex in Greensboro consisting of 176 rental units located in 44 buildings on about 18 acres of land. At least subsequent to March 1971, MIC was engaged in, among other things, the management of rental properties owned by Lindley and Latham. In addition, during the period here in controversy, MIC owned and managed other rental properties.

## 2. Section 482 and Setoff Issues

During the years at issue petitioners were MIC's wholly owned subsidiaries. In 1970, Z. W. Austin (Austin) and O. L. Fryman (Fryman) were substantial stockholders of MIC. On March 20, 1970, Fryman filed a lawsuit against MIC and Austin in the General Court of Justice, Superior Court Division, Greensboro, N.C., and MIC was placed in receivership as a result of that suit.

On August 11, 1970, Austin and Fryman agreed to settle their various disputes, including the lawsuit filed against MIC. However, the agreement to this effect was not timely performed. On February 12, 1971, Austin and Fryman again agreed to resolve their differences, and they incorporated their August 11, 1970, agreement into the provisions of a second agreement.

Among other things, it was agreed that Austin and MIC would secure a loan of not less than $1,800,000 to generate funds necessary to pay the balance of the cash payments required by the terms of the February 12, 1971, and August 11, 1970, agreements. In consideration for such funds, Fryman agreed to sell his MIC stock to Austin and to dismiss his suit against MIC and Austin. As a result of these agreements, Austin became MIC's controlling shareholder.

Rather than borrow the $1,800,000 in funds directly, MIC caused petitioners to secure the funds from Sackman-Gilliland Corp. (hereinafter Sackman), and, in turn, petitioners loaned the funds interest-free to MIC.

Specifically, on or about March 29, 1971, Latham secured a 10-year loan from Sackman in the amount of $925,000, with interest payable at the rate of 10 percent per annum, secured by a first deed of trust on Latham's 140-unit apartment complex and an assignment of the rents. After loan acquisition costs of $24,750 were paid, a portion of the borrowed money was used to pay certain existing obligations of Latham to enable Sackman to secure the first deed of trust on Latham's apartment complex. The obligations which were paid off bore interest at the rate of 4½ percent per annum. The amount of $265,444.49 was disbursed on behalf of MIC. Latham and MIC treated the $265,444.49 disbursement as a loan from Latham to MIC. Thus, after allocation of loan costs and other expenses in connection with the $925,000 loan, Sackman disbursed $865,568.91: $600,124.42, or 69.33 percent, was disbursed with respect to Latham, and $265,444.49, or 30.67 percent, was disbursed for MIC.

On or about March 29, 1971, Lindley secured a 10-year loan from Sackman in the amount of $1,175,000 with interest payable at the rate of 10 percent per annum, secured by a first deed of trust on Lindley's 176-unit apartment complex and an assignment of the rents. After loan acquisition costs of $29,400 were paid, a portion of the borrowed money was used to pay certain of Lindley's existing obligations to enable Sackman to secure the first deed of trust on Lindley's apartment complex. The obligations which were paid off bore interest at the rate of 4½ percent per annum. The amount of $360,538.15 was disbursed on behalf of MIC. Lindley and MIC treated the $360,538.15 disbursement from Sackman as a loan from Lindley to MIC. Thus, after allocation of loan costs and other expenses for the

$1,175,000 loan, Sackman disbursed $1,121,480.13: $760,942.68, or 67.85 percent, was disbursed with respect to Lindley, and $360,538.15, or 32.15 percent, was disbursed for MIC.

The obligations of Lindley and Latham to Sackman, undertaken on March 29, 1971, were further secured by a guarantee agreement executed by MIC. The guarantee agreement was secured by first deeds of trust on an office building located at 1808 Spring Garden Street, Greensboro, and an apartment building located at 301 McIver Street, Greensboro, both owned by MIC, and by a second deed of trust on an apartment complex located on Mosby Drive, Greensboro, also owned by MIC. The guarantee agreement and deeds of trust were executed simultaneously with Lindley's and Latham's procurement of the loans from Sackman. MIC's deed of trust securing the guarantee agreement was released by Sackman on August 13, 1973.

With respect to its $925,000 loan, Latham paid interest costs to Sackman totaling $34,681.09 during the fiscal year ended June 30, 1971, and $91,901.29 during the fiscal year ended June 30, 1972. With regard to the $1,175,000 loan, Lindley paid interest costs to Sackman totaling $102,580.16 during the taxable year 1971 and $116,101.37 during the taxable year 1972. Neither petitioner charged MIC interest nor did MIC pay any interest on the loans it received from petitioners totaling $625,982.64.

No fee was charged or accrued by MIC to Lindley or Latham for the execution of the guarantee agreement and deed of trust nor was any sum deducted by Lindley or Latham on its Federal corporate income tax returns for the years in issue for any such fee.

Thus, on or about March 29, 1971, MIC received interest-free loans from Latham and Lindley totaling $625,982.64. Of that amount, $618,618.71 was utilized by MIC to resolve the legal suit filed by Fryman through funding of Austin's personal obligation to Fryman and to pay the legal and accounting fees stemming from that action. No portion of that amount was expended for MIC's operations in carrying on its trade or business and no income was realized by MIC as a result of receiving that amount in loans. The remaining amount of $7,363.93 was expended for MIC's business operations, and income was realized by MIC as a result of receiving that amount.

For the years ended April 30, 1971, April 30, 1972, and April 30, 1973, MIC reported total assets, gross rents, gross income,

and taxable income (loss) on its Federal corporate income tax returns as follows:

|  | Total assets | Gross rents | Gross income | Taxable income |
|---|---|---|---|---|
| 4/30/71 | $1,391,487.00 | $64,589.68 | $207,809.47 | $(39,260.75) |
| 4/30/72 | 1,526,655.37 | 78,110.53 | 138,622.28 | 23,077.50 |
| 4/30/73 | 2,130,113.35 | 89,524.08 | 192,507.75 | 41,323.07 |

The taxable income reported for the years ended April 30, 1972, and April 30, 1973, was extinguished by net operating loss carryover deductions. For each of the above years, MIC reported a negative cash flow.

For the years ended June 30, 1969, June 30, 1970, June 30, 1971, and June 30, 1972, Latham reported total assets, gross rents, gross income, and taxable income (loss) on its Federal corporate income tax returns as follows:

|  | Total assets | Gross rents | Gross income | Taxable income |
|---|---|---|---|---|
| 6/30/69 | $618,224.69 | $157,759.56 | $159,326.58 | $3,990.68 |
| 6/30/70 | 614,263.96 | 156,405.59 | 161,330.05 | (1,019.33) |
| 6/30/71 | 819,120.62 | 167,575.83 | 168,900.24 | (50,114.46) |
| 6/30/72 | 932,924.93 | 197,939.44 | 199,499.80 | (4,754.73) |

For the taxable years 1969, 1970, 1971, and 1972, Lindley reported total assets, gross rents, gross income, and taxable income (loss) on its Federal corporate income tax returns as follows:

|  | Total assets | Gross rents | Gross income | Taxable income |
|---|---|---|---|---|
| 1969 | $676,802.00 | $210,457.59 | $213,349.62 | $8,553.88 |
| 1970 | 665,636.24 | 210,628.94 | 215,055.13 | (12,921.65) |
| 1971 | 954,716.56 | 242,872.25 | 242,897.55 | (65,140.73) |
| 1972 | 1,067,374.94 | 263,068.43 | 263,530.09 | (21,677.50) |

In his statutory notices of deficiency issued to each petitioner for its taxable year 1972, respondent allocated interest income on the interest-free loans, totaling $625,982.64, made to MIC at the same interest rate that petitioners were charged in securing these funds from Sackman. In addition, respondent allocated the loan costs incurred by petitioners to MIC on a pro rata basis, reflecting the percentages of the loans received by MIC from Latham and Lindley (i.e., 30.67 percent and 32.15 percent, respectively).[2]

---

[2] In making his determination, respondent applied the "situs of the borrower" rule, sec. 1.482-2(a)(2)(ii), Income Tax Regs., in allocating interest income to petitioners. On brief respondent

### 3. *Management Fee Issue*

In 1965 and 1967, Latham and Lindley, respectively, entered into agreements with Brown Realty Co., Inc. (Brown), a company which enjoyed a good reputation in the Greensboro area, for the management of the apartment complexes. In summary, the agreements provided that Brown would undertake the following duties:

(a) Employ administrative personnel necessary to discharge its duties as agent;

(b) Employ personnel or contract with contractors as necessary for the maintenance and repair of the apartment projects;

(c) Supervise the work of all such employees or contractors;

(d) Accept applications for tenants and execute leases for tenants;

(e) Collect all monthly rentals from tenants;

(f) Take necessary action to enforce collection of rents from tenants;

(g) Maintain the buildings, appurtenances, and grounds in an acceptable manner, including painting, decorating, plumbing, carpeting, etc.;

(h) Make contracts for all utilities required to be furnished subject to owner's approval; and

(i) Maintain hazard insurance.

For these services, Brown received a commission of 6 percent of gross rents collected and was entitled to retain any commissions payable by reason of its placement of hazard insurance policies. The agreements with Brown continued until April 1971, when the agreements were terminated.

Brown was familiar with the management needs of petitioners' apartment complexes since it had owned those properties prior to 1969. Brown did a good job in managing and maintaining the properties during the years in issue up to the termination of the management contract on or about April 1, 1971. Brown did not have an office on petitioners' apartment

---

concedes that the lower interest rate prescribed by sec. 1.482–2(a)(2)(iii), Income Tax Regs., should apply. This concession will be reflected in the Rule 155 computations. Further, the sec. 482 issue is disputed for petitioners' respective taxable year 1971, but no deficiency is involved due to net operating losses incurred by petitioners in that year. Finally, petitioners concede that if the allocation of interest income is authorized, loan costs may also be allocated.

premises, but it had a property manager who inspected the premises at least once a week.

During the period that Brown managed petitioners' properties, Austin, who was the president of petitioners and MIC during the years in issue, performed certain management functions for Latham and Lindley. He reviewed the monthly accounting statements compiled by Brown; he approved all expenditures by Brown in excess of $200; on one occasion he obtained services of a painting contractor to paint Latham at a savings over what Brown had proposed; he observed jobs done by Brown's paint crews to see if they were properly done; on one occasion he saw about replacement of shutters at Latham; he consented to a purchase of lawn equipment by Brown; and he verified the purchase of a number of refrigerators, water heaters, and stoves.

As a result of the litigation with Fryman, MIC was in receivership from May 1970 through March 31, 1971, a period which ran concurrently with Brown's management contract. During the latter part of this receivership, the receiver engaged the services of a firm to manage MIC's properties.[3] The firm charged a managment fee of 6 percent of gross rentals.

After the termination of Brown's management contract, on or about April 1, 1971, MIC took over the management reins of petitioners' properties from Brown. The services rendered by MIC to petitioners were not substantially different from those services Brown previously had rendered to petitioners.

MIC hired one full-time employee and one part-time worker to manage petitioners' properties. In addition some rents were raised and collected, and bookkeeping duties were performed. In 1971 and 1972, MIC made some expenditures for a number of furnaces, a roof, and the painting of apartment exterior surfaces. There was no contract, agreement, corporate minutes, or other similar evidence of an understanding between petitioners and MIC which obligated petitioners to pay MIC any money for management services.

The prevailing rate charged throughout the Greensboro area during the period 1969 through 1972 for the management of

---

[3]The parties stipulated that MIC managed its own rental properties during the periods in question. However, the record clearly indicates that during a part of this receivership, another firm was brought in to manage those properties.

unfurnished rental properties not under any major renovation or repair was 6 percent.

The following management fees paid to Brown by petitioners were deducted and allowed by respondent and are not at issue here for income tax purposes:

|  | 7/1/68— 6/30/69 | 7/1/69— 6/30/70 | 7/1/70— 4/1/71 |
|---|---|---|---|
| Latham | $9,429.31 | $9,390.33 | $7,508.66 |
|  | Calendar year 1969 | Calendar year 1970 | 1/1/71— 4/1/71 |
| Lindley | $12,886.68 | $12,605.05 | $3,163.05 |

In addition to the management fees claimed for Brown, Latham also claimed a deduction for management fees paid to MIC which respondent adjusted as follows:

| FYE June 30— | | | | |
|---|---|---|---|---|
|  | 1969 | 1970 | 1971 | [1]1972 |
| Claimed | $30,000 | $30,000 | $30,000.00 | $27,600.00 |
| Allowed: |  |  |  |  |
| 6 percent of gross rents | 0 | 0 | 10,054.50 | 11,876.37 |
| Less amount paid to Brown | NA | NA | (7,508.66) | NA |
| Additional lump sum | 5,000 | 5,000 | 5,000.00 | 5,000.00 |
| Total allowed | 5,000 | 5,000 | 7,545.84 | 16,876.37 |
| Disallowed | 25,000 | 25,000 | 22,454.16 | 10,723.63 |

[1]Managed solely by MIC.

In addition to management fees claimed for Brown, Lindley also claimed a deduction for management fees paid to MIC which respondent adjusted as follows:

|  | 1969 | 1970 | 1971 | [1]1972 |
|---|---|---|---|---|
| Claimed | $45,000 | $45,000 | $24,287.00 | $39,460.00 |
| Allowed: |  |  |  |  |
| 6 percent gross rent | 0 | 0 | 14,572.32 | 15,784.08 |

| | 1969 | 1970 | 1971 | [1]1972 |
|---|---|---|---|---|
| Less amount paid Brown | NA | NA | (3,163.05) | NA |
| Additional lump sum | 5,000 | 5,000 | 5,000.00 | 5,000.00 |
| Total allowed | 5,000 | 5,000 | 16,409.27 | 20,784.08 |
| Disallowed | 40,000 | 40,000 | 7,877.73 | 18,676.92 |

[1]Managed solely by MIC.

## 4. *The Delinquency Penalty Issue*

Austin, president of petitioners and MIC, hired Ray Spaulding, a retired Internal Revenue Service employee, to keep MIC's books and file petitioners' returns. During the early part of 1970, Joseph A. Sansone (Sansone), a Greensboro attorney, was also hired by Austin to prepare and file petitioners' returns.

With respect to Latham's returns due on September 15, 1969, September 15, 1970, and September 15, 1972, and with respect to Lindley's returns due on March 15, 1970, and March 15, 1973, Austin filed requests for extensions of time for filing those returns. Sansone signed petitioners' returns for the taxable years 1969 through 1972 as the preparer of those returns.

As a result of the Fryman litigation, MIC was in receivership from May 1970, through about March 31, 1971. Sansone was dismissed by the receiver of the corporation in May 1970, and the accounting firm of Peat, Marwick & Mitchell was hired shortly thereafter. Sansone was rehired in August 1970, worked for several months, and then was replaced by Peat, Marwick & Mitchell around January 1971. During the period that petitioners and MIC were in receivership and during an unspecified period in which petitioners' records were being held by the Internal Revenue Service, those records were available to petitioners.

With respect to Latham's corporate tax returns, the respective due dates and filing dates, along with the penalties determined by respondent under section 6651(a)(1) were as follows:

|                        | 6/30/69  | 6/30/70   | 6/30/72   |
| ---------------------- | -------- | --------- | --------- |
| Due date               | 9/15/69  | 9/15/70   | 9/15/72   |
| Due date extension     | 3/26/70  | 12/15/70  | 12/15/72  |
| Date filed             | 4/21/70  | 4/29/71   | 5/4/73    |
| Months (including the fraction of a month) late | 1 | 5 | 5 |
| Additions to tax determined | 5% | 25% | 25% |

With respect to Lindley's corporate tax returns, the respective due dates and filing dates, along with the penalties determined by respondent under section 6651(a)(1) were as follows:

|                        | 1969     | 1970      | 1972      |
| ---------------------- | -------- | --------- | --------- |
| Due date               | 3/15/70  | 3/15/71   | 3/15/73   |
| Due date extension     | 6/15/70  | None      | 6/15/73   |
| Date filed             | 9/8/70   | 4/29/71   | 7/12/73   |
| Months (including the fraction of a month) late | 3 | 2. | 1 |
| Additions to tax determined | 15% | 10% | 5% |

## OPINION

### 1. *Section 482 Issue*

The parties have stipulated that petitioners paid interest on the loans they obtained from Sackman, and that they advanced $625,982.64 of the proceeds of those loans interest-free to MIC, their parent corporation. Of that amount, MIC used $618,618.71 to settle and pay expenses related to the Fryman lawsuit and realized no income from such use of that amount during the taxable years in controversy. Only the balance of $7,363.93 was used in MIC's business. Relying on section 482, the Commissioner nonetheless allocated interest income to petitioners on the full amount of their MIC loans for the controverted taxable periods in which the loans were made. The issue to be decided is whether, in the stated circumstances, section 482 authorizes such an allocation. We hold that it does.

Section 482[4] empowers the Commissioner to "distribute,

---

[4]SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.
In any case of two or more organizations, trades, or businesses (whether or not incorporated,

apportion, or allocate gross income, deductions, credits, or allowances" between or among "two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests" if he determines that such an allocation is "necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." Amplifying this grant of broad powers are regulations defining the objective of section 482 and dealing specifically with interest-free loans between commonly controlled organizations.

Section 1.482–1(b)(1), Income Tax Regs., states that "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer." The touchstone "in every case" for determining "the true taxable income * * * of a controlled taxpayer * * * is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer."[5]

Section 1.482–1(c), Income Tax Regs., setting forth guidelines for determining the "true taxable income," points out that the Commissioner's authority is not limited to improper accounting or sham transactions and adds:

The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Section 1.482–2(a)(1), Income Tax Regs., deals specifically with "loans or advances" and provides the Commissioner with authority to allocate interest income as follows:

Where one member of a group of controlled entities makes a loan * * * to * * * another member of such group, and charges no interest, * * * the * * *

---

whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

[5] Sec. 1.482–1(a)(6), Income Tax Regs., defines "true taxable income" as follows:

"The term 'true taxable income' means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. * * *"

[Commissioner] may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.

With particular application to the situation where, as in the instant case, no income was produced by the loaned funds during the taxable year, section 1.482–1(d)(4), Income Tax Regs., provides in part as follows:

If one member of a group lends money to a second member of the group in a taxable year, the * * * [Commissioner] may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year *even if the second member does not realize income during such year.* The provisions of this subparagraph apply *even if the gross income contemplated from a series of transactions is never, in fact, realized by the other members.* [Emphasis added.]

These regulations clearly support respondent's section 482 allocation of interest income to petitioners. Had petitioners and MIC not been controlled by the same interests and dealt at arm's length, petitioners would have charged MIC for the use of their money. MIC's failure to pay petitioners any interest on the loans reduced petitioners' taxable income from what it would have been had the parties dealt at arm's length. Under these regulations, the Commissioner clearly was authorized to make appropriate allocations of interest income to petitioners in order to reflect an arm's length interest rate even though the advanced funds were not used in such way as to produce income during the taxable years. A correlative adjustment is deemed to have been made in favor of MIC.[6] Without this allocation, the income tax returns of the members of the commonly controlled group would not clearly reflect their true taxable incomes.

The issue is thus narrowed to whether the quoted sections 1.482–1(d)(4) and 1.482–2(a)(1) of the regulations are valid. We approach this issue in the light of the repeated admonition that Income Tax Regulations must be sustained unless unreasonable

---

[6]MIC's incomes for its taxable years ended Apr. 30, 1972, and Apr. 30, 1973, were extinguished by a net operating loss carryover. Making correlative adjustments in MIC's taxable income by allowing appropriate interest deductions, therefore, will not affect MIC's income tax liability for those years. Sec. 1.482–1(d)(2), Income tax Tax Regs., however, provides:

"If a correlative adjustment is not actually made because it would have no effect on the U.S. income tax liability of the other member involved in the allocation for any pending taxable year, such adjustment shall nevertheless be deemed to have been made for the purpose of determining the U.S. income tax liability of such member for a later taxable year, or for the purposes of determining the U.S. income tax liability of any person for any taxable year. The district director shall furnish to the taxpayer with respect to which the primary adjustment is made a written statement of the amount and nature of the correlative adjustment which is deemed to have been made."

See *Collins Electrical Co. v. Commissioner,* 67 T.C. 911, 922–923 (1977).

and plainly inconsistent with the revenue statutes, and they are not to be overruled except for weighty reasons. *Commissioner v. South Texas Co.*, 333 U.S. 496, 501 (1948), revg. 162 F.2d 866 (5th Cir. 1947), revg. 7 T.C. 669 (1946); see also *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931). The Court's task is not to sit as a committee to revise or perfect the regulations. Its role "begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner." *United States v. Correll*, 389 U.S. 299, 307 (1967); *Commissioner v. Stidger*, 386 U.S. 287, 296 (1967), revg. 355 F.2d 294 (9th Cir. 1965), revg. 40 T.C. 896 (1963).

We think the disputed regulations are consistent with the legislative purpose and the broad, comprehensive language of section 482. The section contemplates that transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. The regulations embody the declared legislative purpose to authorize the distribution of income or deductions among commonly controlled taxpayers to prevent evasion of taxes "by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking.' " H. Rept. 2, 70th Cong., 1st Sess., 1939–1 C.B. (Part 2) 384,395; *Ach v. Commissioner*, 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966).

An obvious method which can be used to milk one commonly controlled organization for the benefit of another is the making of interest free loans. Under this method, the lending entity, by not reporting interest on the loans, has lower earnings and, consequently, lower taxes. By not paying interest, the borrowing entity, if it has no net taxable income, merely eliminates a deduction which otherwise would increase its losses. As a group the commonly controlled organizations pay less income tax than they would if they had dealt at arm's length and charged interest on the loans.

That is precisely the situation here. MIC's income tax return for the taxable year ended April 30, 1972, shows MIC had total income of $138,622.28 and, after taking current operating deductions, taxable income of $23,077.50, which was completely extinguished by a carried-over net operating loss. Similarly,

MIC's income during its fiscal year ended April 30, 1973, was extinguished by a net operating loss carryover. Deductions for interest on the loans from petitioners, therefore, would have given MIC no tax benefit. Yet, had MIC paid interest to petitioners, such payments, as indicated by the deficiencies in dispute, would have fallen on top of other taxable income.[7] Thus, if no section 482 allocation is made, the commonly controlled group's taxes will be less than if MIC had paid interest on the loans. As stated by *Kahler Corp. v. Commissioner*, 486 F.2d 1, 5 (8th Cir. 1973), revg. 58 T.C. 496 (1972), discussing a comparable factual situation: "It is difficult to imagine a situation in which Section 482 would be more applicable on either an equitable or a legal basis."

True, the trial record does not trace the precise dollars comprising the proceeds of the tax-free loans to the production by MIC of any income during the taxable years in dispute. To be sure, however, MIC's ability to use $618,618.71 of interest-free funds from its wholly owned subsidiaries to pay off the Fryman claim and legal expenses enabled it to continue to realize income that it might have been required to forego had petitioners not made the loans. For example, MIC's income tax return for the taxable year ended April 30, 1972, shows that MIC had assets of $1,526,655.37 consisting in part of real property which produced gross rents of $78,110.53. Had MIC been compelled to liquidate enough of this rental property or other assets to pay the Fryman claim, its total income of $138,622.28 might have been reduced. In principle, the situation was the same during the taxable year ended April 30, 1973.

Moreover, the regulations do not require the dollars comprising the loan to be traced to the production of income. They apply even if the gross income contemplated by the loan "is never, in fact, realized." Sec. 1.482–1(d)(4), Income Tax Regs.; *Fitzgerald*

---

[7]Latham, for its fiscal year ended June 30, 1971, and Lindley, for its taxable year 1971, reported net operating losses which were reduced for purposes of a carryback deduction to the taxable year ended June 30, 1969, and the taxable year 1969, respectively, by the allocation of interest income to those entities on the portion of each of their Sackman loans which was used for MIC's benefit. Loss corporations present prime opportunities for the shifting of profits among members of a commonly controlled group of corporations, and sec. 482 may be used to correct distortions of their income or losses. See, e.g., *Ballentine Motor Co. v. Commissioner*, 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962); *Aiken Drive-In Theatre Corp. v. United States*, 281 F.2d 7, 10 (4th Cir. 1960).

*Motor Co. v. Commissioner*, 508 F.2d 1096,1100 (5th Cir. 1975), affg. 60 T.C. 957 (1973).[8]

Several courts of appeals have upheld these regulations if factual situations where no income was realized from the loan received by the controlled recipient organization. In *B. Forman Co. v. Commissioner*, 453 F.2d 1144, 1156 (2d Cir. 1972), affg. in part and revg. in part 54 T.C. 912 (1973), cert. denied 407 U.S. 934 (1972),[9] the court, after quoting sections 1.482–1(a)(6) and 1.482–2(a) of the regulations, said:

These regulations must prevail, for they are entirely consistent with the scope and purpose of section 482. The instant loans without interest are obviously not at arm's length, since no unrelated parties would loan such large sums without interest. The allocation of the interest income to taxpayers was necessary in order to properly reflect their taxable incomes.

In *Kahler Corp. v. Commissioner*, 486 F.2d at 5, the Court of Appeals, in the course of sustaining the disputed regulations, stated:

The proper standard to be applied in cases such as this is whether or not the loans from the taxpayer to other members of a controlled group would have been made on an interest free basis in arm's length dealings between uncontrolled taxpayers. Whether the Commissioner shows that the borrowed funds actually produced income for the borrowing corporation is of no importance. Money, and the use of money, is an essential element in the profit making activities of most corporations, just as raw material is a necessary component in the manufacture of salable goods. [Fn. ref. omitted.]

To the same effect see *Kerry Investment Co. v. Commissioner*, 500 F.2d 108, 109–110 (9th Cir. 1974), affg. in part and revg. in

---

[8]In *Fitzgerald Motor Co. v. Commissioner*, 60 T.C. 957 (1973), affd. 508 F.2d 1096 (5th Cir. 1975), this Court found that the taxpayer had not carried its burden of proof under a rule enunciated by *Kerry Investment Co. v. Commissioner*, 58 T.C. 479 (1972), affd. in part and revd. in part 500 F.2d 108 (9th Cir. 1974), that a taxpayer seeking to avoid the impact of an adverse determination by the Commissioner must show that the proceeds of each particular loan made at less than an arm's-length interest rate were not used by the borrower to produce gross income in the taxable year. The Court of Appeals affirmed on the ground that sec. 482 applies in such circumstances "regardless of whether or not the debtor uses it [i.e., the loan] to produce income." *Fitzgerald Motor Co. v. Commissioner*, 508 F.2d at 1101.

[9]The issue here presented was not considered by the Tax Court in *B. Forman Co. v. Commissioner*, 54 T.C. 912 (1970), affd. in part and revd. in part 453 F.2d 1144 (2d Cir. 1972), cert. denied 407 U.S. 934 (1972), because the Tax Court had found sec. 482 inapplicable for another reason which was rejected by the Court of Appeals.

part 58 T.C. 479 (1972),[10] and *Fitzgerald Motor Co. v. Commision-er, supra* at 1101.

Petitioners ask us to reject the teaching of these courts of appeals' opinions and base our conclusion on *Smith-Bridgman & Co. v. Commissioner*, 16 T.C. 287 (1951); *PPG Industries, Inc. v. Commissioner*, 55 T.C. 928 (1970); and this Court's opinions in *Kerry Investment Co. v. Commissioner, supra,* and *Kahler Corp. v. Commissioner, supra,* all involving loans at less than arm's-length rates. That line of cases enunciates the doctrine that section 482 may not be used to "create" income, i.e., no allocation may be made unless income was produced by the proceeds of the interest-free loan. Those cases also reason that the lender may not be taxed on interest with respect to a loan where it was not intended that interest be collected. But those Court opinions were written before sections 1.482-1(d)(4) and 1.482-2(a), Income Tax Regs., were issued in 1968, T.D. 6952, 1968-1 C.B. 218,[11] or did not focus on such regulations. Those regulations are dispositive of the instant issue. True, section 482 was not changed before the 1968 regulations were issued, but the Commissioner has a well-recognized authority to alter regulations, despite the absence of any change in the statutory language. *Helvering v. Wilshire Oil Co.*, 308 U.S. 90, 97, 100–101 (1939), revg. 95 F.2d 971 (9th Cir. 1938), affg. 35 B.T.A. 450

---

[10]In *Kerry Investment Co. v. Commissioner*, 500 F.2d at 109–110, the Court of Appeals upheld the disputed regulations and said:

"Any scheme which permits related entities to regulate their tax obligations by transfer and retransfer of monies between themselves should be carefully scrutinized. When a taxpayer lends $500,000 to a wholly owned subsidiary without interest, it is obvious that the lender is likely divesting itself of interest income that it could have earned by making interest-bearing loans in a competitive market. When such an interest-free loan is made, we see no reason why an allocation of some income on the loan should not be made to the taxpayer even if the interest-free loan did not result in the production of gross income. In short, we hold that tracing in order to determine whether the borrowed funds generated gross income to the borrower is neither necessary nor required."

[11]In *B. Forman Co. v. Commissioner*, 453 F.2d at 1156, the Court of Appeals discussed, among other cases, *Smith-Bridgman & Co. v. Commissioner*, 16 T.C. 287 (1951), and *PPG Industries, Inc. v. Commissioner,* 55 T.C. 928 (1970), and stated as follows:

"To the extent that the above cases cited by taxpayers may be read as holding that no interest can be allocated under section 482 under the facts of this case [an interest-free loan not shown directly to have produced income], they are not in accord with either economic reality, or with the declared purpose of section 482. They seriously impair the usefulness of section 482. Those cases may be correct from a pure accounting standpoint. Nevertheless, interest income may be added to taxpayers' incomes, as long as a correlative adjustment is made to * * * [the borrowing corporation], for then the true taxable income of all involved will be properly reflected. * * * "

See also *Kahler Corp. v. Commissioner*, 486 F.2d 1, 4–5 (8th Cir. 1973), revg. 58 T.C. 496 (1972).

(1937); *Continental Oil Co. v. Jones,* 176 F.2d 519, 522 (10th Cir. 1949); *Taubman v. Commissioner,* 60 T.C. 814, 817–818 (1973).

In summary, we conclude that sections 1.482–1(d)(4) and 1.482–2(a)(1), Income Tax Regs., are valid, and we sustain respondent's allocation of interest income to petitioners on the loans they made to MIC, their parent corporation. To the extent our conclusion herein is inconsistent with the opinions in *Smith-Bridgman & Co. v. Commissioner, supra; PPG Industries, Inc. v. Commissioner, supra; Kerry Investment Co. v. Commissioner, supra;* and *Kahler Corp. v. Commissioner, supra,* those opinions no longer will be followed.

### 2. *Setoff Issue*

Section 1.482–1(d)(3), Income Tax Regs., provides, in pertinent part, as follows:

In making distributions, apportionments, or allocations between two members of a group of controlled entities with respect to particular transactions, the district director shall * * * consider the effect of any * * * non-arm's length transaction between them in the taxable year which, if taken into account, would result in a set-off against any allocation which would otherwise be made, provided the taxpayer is able to establish with reasonable specificity that the transaction was not at arm's length and the amount of the appropriate arm's length charge. For purposes of the preceding sentence, the term arm's length refers to the amount which * * * would have been charged in independent transactions with unrelated parties under the same or similar circumstances considering all the relevant facts * * *

Petitioners argue that, if interest income is allocated to them by the respondent under section 482, they are entitled under this regulation, to setoff deductions against those allocations due to the fact that MIC guaranteed petitioners' loans from Sackman. We disagree.

For purposes of determining whether a setoff deduction for MIC's guarantee of loans to petitioners is justified, the regulations prescribe the standard of an "appropriate arm's length charge," which is the "amount which * * * would have been charged in independent transactions with unrelated parties under the same or similar circumstances considering all the relevant facts." Petitioners argue that if they and MIC had been unrelated parties in an independent transaction, MIC would have charged a fee of 3 to 5 percent of the total indebtedness of $2,100,000 for guaranteeing the loans. However, we think that

petitioners overlook the requirements of the regulation that all the "relevant facts" must be considered.

It is difficult to imagine that an unrelated third party, standing in petitioners' shoes, would have entered into a transaction of the nature presented in the instant case. During the early part of 1971, MIC desperately needed funds to settle the Fryman lawsuit filed against it by one of its shareholders. Instead of borrowing the funds directly, MIC, which had a negative cash flow, had reported a loss for its taxable year ended April 30, 1971, and according to an expert witness, had a net worth of only $400,000 to $600,000, caused petitioners to secure funds from Sackman. In doing so, petitioners gave up the favorable 4½ percent interest loans totaling some $1,360,000 on their properties and obligated themselves on 10-percent loans, totaling some $2,100,000 secured not only by their properties but also by assignments of their rents. Also nearly one-third of the borrowed $2,100,000, an amount greater than MIC's net worth, went to MIC for use in settling the Fryman lawsuit. Obviously, from petitioners' viewpoint, this whole transaction was bad business. To say that petitioners, nonetheless, should have paid a fee to MIC for guaranteeing the loans from which only MIC benefited, is almost unthinkable.

Petitioners contend that by removal of the existing mortgages which secured FHA-guaranteed loans, they were able to charge higher rental rates since those rates were no longer subject to FHA approval. True, petitioners' gross rents, as reflected in our findings, increased after the 4½-percent loans were paid, but we are not satisfied that those increases could not have been made with FHA sanction. The record suggests that the increased rents were necessary to increase petitioners' cash flow so that they could pay off the debt to Sackman. Moreover, as reflected in our findings, the increases in rents amounted to less than the additional 5½-percent interest obligations petitioners were required to discharge on the new 10-percent loans.

In sum, we conclude the relevant facts indicate that a guarantee fee is not "appropriate," within the meaning of section 1.482–1(d)(3), Income Tax Regs., under the circumstances of this case. We note also that petitioners made no attempt to

satisfy the 30-day notice requirement of the above-quoted regulations.[12] See *Liberty Loan Corp. v. United States*, 498 F.2d 225, 231 (8th Cir. 1974), cert. denied 419 U.S. 1089 (1974).

### 3. *Management Fee Issue*

Section 162(a)(1) grants the taxpayer a deduction for all the ordinary and necessary business expenses paid or incurred, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." The issue requires a factual determination of a reasonable allowance for the management services performed by MIC in regard to petitioners' apartment complexes during the taxable years 1969 through 1972.

Until April 1, 1971, Brown was under contract to manage petitioners' apartment complexes and was paid 6 percent of the gross rents for those services. After April 1, 1971, management funtions were performed by MIC. For the taxable years 1969, 1970, and part of 1971, petitioners deducted management fees paid to Brown in the amount of 6 percent of gross rents. In addition to these amounts, petitioners, during the taxable years 1969 through 1972, also deducted larger amounts for management fees paid to MIC. Respondent allowed the 6 percent paid to Brown, but determined that the fees paid to MIC were unreasonable and excessive to the extent they exceeded 6 percent of gross rents during the period the properties were not managed by Brown. Respondent also allowed $5,000 for each petitioner per year. We agree with respondent's determination.

The prevailing rate charged by professional management agencies in the Greensboro area was 6 percent. We think this figure represents an arm's-length rate and is controlling in the instant case. See *Place v. Commissioner*, 17 T.C. 199, 203 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953); *Stanwick's, Inc. v. Commissioner*, 15 T.C. 556, 560–561 (1950), affd. per curiam 190 F.2d 84 (4th Cir. 1951);

---

[12]Sec. 1.482–1(d)(3), Income Tax Regs., provides:

"In order to establish that a set-off to the adjustments proposed by the district director is appropriate, the taxpayer must notify the district director of the basis of any claimed set-off at any time before the expiration of the period ending 30 days after the date of a letter by which the district director transmits an examination report notifying the taxpayer of proposed adjustments or before July 16, 1968, whichever is later. * * * "

*Limericks, Inc. v. Commissioner*, 7 T.C. 1129, 1134 (1946), affd. 165 F.2d 483 (5th Cir. 1948). The additional amount allowed by respondent, $10,000 for each year in issue, is certainly reasonable in the light of the trial record.

### 4. *The Delinquency Penalty Issue*

Section 6651(a)(1) provides that failure to timely file a Federal income tax return results in a penalty of 5 percent per month up to a maximum of 25 percent "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Whether petitioners have reasonable cause for failing to timely file their returns is a question of fact, and petitioners have the burden of proving that reasonable cause exists. *Ferrando v. United States*, 245 F.2d 582, 589 (9th Cir. 1957).

Petitioners argue that their failure to file timely returns may be excused because they relied upon an attorney hired by their parent corporation and an accounting firm hired by the receivers to file their returns. We disagree.

The general rule is that the filing of a return when due is the personal, nondelegable duty of the taxpayer and reliance upon an accountant or attorney to so file is no excuse for late filing. *Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 854 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court; *Ferrando v. United States, supra* at 589. A taxpayer who has failed to file a timely return may demonstrate reasonable cause by showing that he acted in good faith reliance upon the advice of an attorney or an accountant to whom full disclosure of the relevant facts was made. *Paula Construction Co. v. Commissioner*, 58 T.C. 1055, 1061 (1972), affd. per curiam 474 F.2d 1345 (5th Cir. 1973); *West Coast Ice Co. v. Commissioner*, 49 T.C. 345, 351 (1968). However, this exception is limited to situations where a taxpayer relies upon the professional advice or judgment as to a question of tax law. *West Coast Ice. Co. v. Commissioner, supra* at 351; see *Estate of Lammerts v. Commissioner*, 54 T.C. 420, 446 (1970), affd. per curiam 456 F.2d 681 (2d Cir. 1972). Petitioners have shown no facts which would allow them to fall within this narrow exception.

Austin, petitioners' president, signed requests for extensions of time on five of the six returns required to be filed for the taxable years at issue herein and hired someone to file the returns due for each year. Thus he was well aware that

petitioners' returns would be delinquent if not filed within the due dates. Yet, even with this knowledge, all six returns were filed late. The trial record simply will not support a finding that petitioners' late filing of their returns was due to reasonable cause.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

SCOTT, *J.*, concurring: I concur in the result reached by the majority in this case since section 482 permits the allocation not only of income but also of deductions. The net effect of respondent's determination in this case is to allocate to MIC those portions of the interest and amortized loan costs paid by petitioners to Sackman which relate to the portions of the loans advanced by petitioners to MIC. As an allocation of a deduction, respondent's action is clearly proper.[1]

Respondent's regulations state that the purpose of section 482 is to place a controlled taxpayer "on a tax parity with an uncontrolled taxpayer." (Sec. 1.482–1(b), Income Tax Regs.) To allocate to MIC the portions of the interest deductions and amortized loan costs paid by petitioners with respect to the funds advanced to MIC accomplishes this result, whereas the approach taken by the majority does not fully prevent the tax avoidance so very evident in this case.

Section 1.482–1(d)(1), Income Tax Regs., provides, in part, that:

The method of allocating, apportioning, or distributing income, deductions, credits, and allowances * * * , including the form of the adjustments and the character and source of amounts allocated, shall be determined with reference to the *substance* of the particular transactions or arrangements which result in the avoidance of taxes or the failure to clearly reflect income. [Emphasis added.]

In economic reality, MIC was the true borrower of the funds it received from petitioners. The loans from Sackman, to the

---

[1]The concession by respondent relating to the proper computation of the imputed interest rate under sec. 1.482–2(a)(2), Income Tax Regs., would be ineffective under my approach.

extent petitioners advanced amounts thereof to MIC, were only formally indebtedness of petitioners. The tax avoidance here arises from the allowance of interest deductions to petitioners on the portions of the loans used by MIC. Making a proper allocation of the interest deductions and amortized loan costs (which is the substance of the adjustment made by respondent in the notice of deficiency) fully eliminates the tax avoidance here occasioned by the relationship of the parties, whereas the adjustment contended for by respondent does not.[2] Furthermore, the approach adopted by the majority requires reversing our holding in *Kahler Corp. v. Commissioner*, 58 T.C. 496 (1972), revd. 486 F.2d 1 (8th Cir. 1973), and *Kerry Investment Co. v. Commissioner*, 58 T.C. 479 (1972), affd. in part and revd. in part 500 F.2d 108 (9th Cir. 1974), as well as some earlier opinions of this Court. In the *Kahler* and *Kerry* cases, we found the advancements by one related entity to another to be of the funds of the entity making the advance.[3] In neither of those cases did we find a basis for the allocation of deductions between related entities; nor did we consider the propriety of such an allocation. Those cases as decided in this Court presented clearly the question of "imputed income" where no income in fact existed. The instant case, only by a most strained analysis, i.e., isolation of only part of the whole transaction, raises such an issue. This is not the proper case in which to reconsider our position in the *Kahler* and *Kerry* cases, and I would not reconsider our position in those cases on the facts here present.

Since the net effect of respondent's adjustment here was an allocation of interest deductions, in my view this Court may sustain his determination on that basis. It is well recognized that if respondent's determination is correct, it may be sustained even though the reasons he gives for his action are wrong. *Helvering v. Gowran*, 302 U.S. 238 (1937). Petitioners were on notice that section 482 was considered applicable in this case and consequently are not prejudiced by my suggested application of

---

[2] See n. 2 of the majority opinion.

[3] In *Kahler Corp. v. Commissioner*, 58 T.C. 496, 500 (1972), we made a finding to this effect. However, the Circuit Court in its opinion 486 F.2d 1, 2, stated that "during oral argument counsel for Kahler conceded that * * * Kahler owed and paid interest on total indebtedness exceeding the total * * * owed to Kahler by" its subsidiaries. In n. 8 of its opinion in *Kahler* (486 F.2d at 5), the Circuit Court stated that "it would have been entirely proper in this case for the Commissioner to have allocated to the subsidiaries a portion of the interest deduction taken by Kahler * * *."

section 482. Compare *Commissioner v. Chelsea Products*, 197 F.2d 620, 624 (3d Cir. 1952), affg. 16 T.C. 840 (1951). ·

RAUM, DRENNEN, FAY, AND TANNENWALD, *JJ.*, agree with this concurring opinion.