SALVATORE PISELLO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pisello v. Commissioner
Docket No. 6538-74.
United States Tax Court
T.C. Memo 1979-143; 1979 Tax Ct. Memo LEXIS 382; 38 T.C.M. (CCH) 639; T.C.M. (RIA) 79143; April 12, 1979, Filed Morris Ehrlich, for the petitioner. William F. Halley, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioner's Federal income taxes as follows: Sec. 6651(a) [1]
Sec. 6653(a)
Sec. 6654(a) [2]
additions to
additions to
additions to Year
Deficiency
tax
tax
tax
1965
$67,880.00
$16,970.00
$3,394.00
$1,877.34
1966
9,719.00
2,379.75
475.95
226.09
*383 The following issues remain for our decision: (1) Whether an amount received by petitioner in 1965 constituted taxable income or a nontaxable loan; (2) Whether petitioner diverted and misappropriated funds from his employer in 1966, thereby increasing his taxable income; (3) Whether petitioner's underpayment of Federal income tax for the respective years of 1965 and 1966 was the result of negligence or intentional disregard of the law, within the meaning of section 6653(a); and (4) Whether petitioner failed to file Federal income tax returns for the taxable years at issue due to willful neglect, rather than reasonable cause, within the meaning of section 6651(a). [3]
*384 FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner Salvatore Pisello resided in New York, New York, on the date the petition was filed herein. He did not file Federal income tax returns for the taxable years 1965 and 1966.
Since 1961 petitioner has cohabited with Lucille Barrie (Barrie) although he was legally married to Assunta Pisello.Barrie was the sole shareholder, director, and president of Red Sauce, Inc. (Red Sauce), which owned as its principal asset, the Red Sauce Restaurant in New York. Petitioner was employed as the general manager of the restaurant and received salary income amounting to $200 per week during 1965 and 1966. Some time in 1964, Barrie's brother, Jay Starr (Starr), loaned petitioner $35,000. Prior to the scheduled repayment of this sum in 1965 Starr turned over an additional $115,000 to petitioner. Petitioner informed Starr, inter alia, that this latter sum would be used for a purported real estate development investment on Long Island, New York, and that Starr would share in the profits. Incredibly, Starr testified that he chose neither to investigate the real estate venture, nor to arrive at any definitive *385 understanding as to shares or obligations, or times of payment. Starr eventually discovered that such asserted faith and trust on his part was misplaced because petitioner had gambled away the entire $150,000 and had made no real estate investments of any kind. Petitioner eventually paid $12,000 to Starr, but Starr's subsequent attempts to recover the remaining $138,000 proved futile. For instance, petitioner would deliver postdated checks to Starr and, upon their deposit, such checks would be returned, marked "insufficient funds." Starr finally brought a civil suit which resulted in a $138,000 default judgment against petitioner. Starr also presented his case to the district attorney's office for possible criminal prosecution but that office took no action in the matter. On January 14, 1966, Barrie authorized Red Sauce to enter into a security agreement and pledge all its assets as collateral for an $80,000 loan from Keybro Enterprises (Keybro). Red Sauce was obligated to repay $105,000 which was payable over 210 weekly installments of $500 each with six percent interest.
Keybro paid Red Sauce the $80,500 (which included a $500 refundable deposit) in the form of six checks. *386 The payee on each check was Julius Lentz (Lentz), attorney for Keybro. Four of these checks, totaling $59,500, were endorsed in the following manner: "On account of a loan by Keybro Enterprises, Lender, to Red Sauce, Inc., Borrower, Pay to the order of Red Sauce, Inc." These were deposited in the demand account of Red Sauce at the Merchants Bank of New York. The remaining two checks were for $20,000 and for $1,000. The latter check was endorsed to Red Sauce and delivered to Myron Epstein (Epstein), counsel for Red Sauce, in payment of his fee. Endorsement of the $20,000 check was as follows: "On account of a loan by Keybro Enterprises, Lender, to Red Sauce, Inc., Borrower, Pay to the order of Red Sauce, Inc. or Lucille Barrie." Thereupon, both Lentz and Barrie endorsed the check. After the closing of the loan, petitioner had physical possession of this $20,000 check which he immediately attempted to cash with Epstein's assistance. Petitioner accompanied Epstein to his bank where Epstein introduced petitioner to the chief vice president, Al Faeder (Faeder), and requested that he cash the $20,000 check. Upon his agreement, both Epstein and Faeder marked the check "O.K. for *387 cash." Epstein then departed while petitioner was still sitting at Faeder's desk. No entry of this $20,000 check was made in the demand account of Red Sauce. Aside from the two described transactions of $115,000 and $20,000 in 1965 and 1966, respectively, petitioner's only sources of income during the years in issue were from gambling and from his position as general manager of Red Sauce. From his wages of $5,600 and $10,200, petitioner had Federal income tax withheld in the respective amounts of $582.40 and $1,251.20. For the years 1965 and 1966, respondent computed petitioner's income tax deficiencies using the rates for "married individuals filing separate returns." Respondent allowed petitioner the standard deduction in the amount of $500 for each taxable year in issue. Petitioner did not file a declaration of estimated tax or pay any estimated tax for either 1965 or 1966. OPINION As to the first issue, it is well settled that the economic benefit accruing to the taxpayer is the controlling factor in determining whether a gain is income. James v. United States,366 U.S. 213 (1961); Rutkin v. United States,343 U.S. 130 (1952). Ordinarily *388 a loan will not constitute income to the borrower since the temporary economic benefit he derives from the use of the funds is balanced by his correlative obligation to repay the loan. However, where the loan is obtained by false representations and where no obligation to repay is made by the recipient, the transaction is a wrongful appropriation and, as such, is an illegal gain which is clearly within the purview of section 61. [4]James v. United States,supra at 219. In the instant case, petitioner testified that he had every intention of repaying Starr the $115,000 which he contends was simply borrowed.We find petitioner's testimony incredulous in light of his penchant for gambling and the fact that his total salaries for 1965 and 1966 were $5,600 and $10,200, respectively. [5] Petitioner's testimony is at best a rationalization for his actions *389 since it is likely that most confidence men justify their actions to themselves by convincing themselves that they intend to repay the illegally obtained funds. Such thoughts or plans do not change the tax consequences to the recipient of illegally obtained funds. Cf. McSpadden v. Commissioner,50 T.C. 478, 489 (1968). *390 We find Starr's testimony as unworthy of belief as we do petitioner's. Starr did characterize his $115,000 payment to petitioner as a loan, but on being pressed called it variously an" advance," an "investment," and "as a part of a real estate venture, with the acquisition of land, subdividing, building of houses et cetera." He located this "investment" only as "somewhere in Long Island" saying he could remember no details, and stated both that he was to share in profits and that petitioner promised to repay him. The dealings between Starr and petitioner were entirely oral, and Starr testified he could remember no details except that his repayment "would be in the lesser rather than greater length of time." We can only speculate as to Starr's real reasons for advancing $115,000 to petitioner in 1965. His testimony seemed designed to darken, rather than to shed light upon the transaction. Nor is it relevant to the case at hand that Starr has a claim, nor reduced to judgment, against petitioner for repayment of his alleged loan. To hold otherwise would grant a tax advantage to the confidence man who incorporated a false promise to repay along with his other representations *391 to his payor. United States v. Rochelle,384 F. 2d 748, 752 (5th Cir. 1967). Petitioner argues that he actually repaid $12,000 to Starr, and that such repayment is evidence of his continuous intent to repay Starr. We disagree. The reality of the situation is that petitioner was attempting to stave off a potential lawsuit which Starr was threatening to bring. As Starr testified, he begged petitioner for repayment and such importuning resulted in postdated checks that were eventually returned and marked "insufficient funds." The fact that petitioner had complete control over the funds is sufficient for a finding that they represented taxable income to him and we have so held. Leaf v. Commissioner,33 T.C. 1093, 1096 (1960), affd. 295 F. 2d 503 (6th Cir. 1961). Absent consensual recognition of an obligation to repay and without restriction on the disposition of the proceeds, petitioner is required to report receipts obtained from fraudulently derived funds as gross income. James v. United States,366 U.S. 213, 219 (1961); United States v. Rosenthal,470 F. 2d 837 (2d Cir. 1972). Respondent determined *392 that petitioner obtained this $115,000 by fraud and petitioner has failed to disprove such determination as is required by Rule 142(a), Tax Court Rules of Practice and Procedure. Therefore, we find this issue for respondent. As to issue number (2), petitioner contends that the only inference to be drawn from the fact that the $20,000 check was not deposited in the demand account of Red Sauce is that it was additional interest charged by the lender. The facts belie such an inference. An equally plausible construction of the events is that petitioner, who was at the bank with the $20,000 check fully endorsed and marked "O.K. for cash" and with a bank officer who had agreed to cash it, received the entire proceeds and placed such amount, or part thereof, on the daily double at the local race track. The only evidence offered by petitioner on this issue was his own testimony. He testified that he never approached Epstein, counsel for Red Sauce, for purposes of negotiating the $20,000 check.He also stated that he could not remember why the check was marked "O.K. for cash." To the contrary, Epstein testified that such check was cashed upon petitioner's insistence. The record is devoid *393 of any evidence that the $20,000 represented additional discounted interest or that the $20,000 represented a form of kickback to the lender. Petitioner bears the burden of proof to overcome respondent's determination and its presumption of correctness. Helvering v. Taylor,293 U.S. 507, 515 (1935); Rule 142(a), Tax Court Rules of Practice and Procedure. Based upon the record as a whole, we find that petitioner has not met his burden. See Avery v. Commissioner,574 F. 2d 467 (9th Cir. 1978), affirming a Memorandum Opinion of this Court. Respondent's determination is sustained on this issue. Issue number (3) was not addressed in petitioner's brief or at trial. It is whether petitioner's underpayment of tax for 1965 and 1966 was due to negligence or intentional disregard of rules and regulations pursuant to section 6653(a), and we have held in a number of cases that petitioner has the burden of proof. Estate of Mason v. Commissioner,64 T.C. 651 (1975); Bixby v. Commissioner,58 T.C. 757 (1972); Rosano v. Commissioner,46 T.C. 681 (1966); Courtney v. Commissioner,28 T.C. 658 (1957). *394 Since petitioner has failed to offer proof on this issue, we sustain the respondent's determination. Rule 149(b), Tax Court Rules of Practice and Procedure.
As to issue number (4), the parties stipulated that a nationwide search of Internal Revenue Service records failed to disclose the filing of Federal income tax returns by petitioner for the taxable years 1965 and 1966. Petitioner testified that it was his recollection that he had signed the returns but could not remember whether the returns were blank or complete at such time. On brief, petitioner maintains that an accountant prepared and filed his returns for the years in issue. Petitioner is contending that reasonable cause exists for his failure to file since he exercised ordinary care and prudence through his reliance on an accountant. Such a contention is without merit. A taxpayer may demonstrate reasonable cause by showing that he acted in good faith reliance upon the advice of an accountant to whom full disclosure of the relevant facts was made. Paula Construction Co. v. Commissioner,58 T.C. 1055, 1061 (1972), affd. per curiam 474 F. 2d 1345 (5th Cir. 1973). Nevertheless, this exception *395 is limited to situations where a taxpayer relies upon the professional advice or judgment of an accountant as to a question of tax law. Latham Park Manor, Inc. v. Commissioner,69 T.C. 199, 219 (1977); Sanderling, Inc. v. Commissioner,66 T.C. 743, 759 (1976); West Coast Ice Co. v. Commissioner,49 T.C. 345, 351-352 (1968). Since petitioner has the burden of proof and presented no evidence to bring himself within this exception, we therefore hold that petitioner failed to file Federal income tax returns for 1965 and 1966 due to willful neglect within the meaning of section 6651(a). [6]
For all of the above reasons, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue. ↩
2. Liability for the additions for failure to pay estimated taxes is dependent on issues (1) and (2).↩
3. Respondent has determined that petitioner received compensatory income during the years 1965 and 1966 in the amounts of $5,600 and $10,200, respectively. Petitioner has offered no evidence on this issue, nor has he argued it on brief. We have therefore concluded that petitioner has conceded the issue.↩
4. The definition of gross income under section 61 as "all income from whatever source derived" has been held to encompass all accessions to wealth, clearly realized, and over which the taxpayer has complete dominion. Commissioner of Internal Revenue v. Glenshaw Glass Co.,348 U.S. 426↩ (1955).
5. The tangled web of financial events that petitioner weaved was occasioned by his gambling, as he so testified: Q And do you recall the circumstances under which you received this $115,000.00? A At the time I was engaged also in the horse business, race horses, and I was gambling a lot, and I needed money, and I was trying to do almost anything to make enough money to keep myself going, because I was bambling so heavily. * * *
Q Did you have in your mind at that time any manner in which you were going to repay this loan? Did you have any enterprise you believed you were about to engage in that would cause you to have sufficient funds to repay the loan? A No, I just felt that if I did get lucky, I would pay him * * * * * *
Q * * * You said before that you were involved in the horse business. Do you mean you were playing the horeses or-- A I was playing the horses, and Mrs. Lucille Barrie owned horses. Q And was this--what was the disposition of the $115,000.00 in regard to the gambling? A I was gambling heavy and I lost it. I lost it at the race track.↩
6. In addition to the penalties under section 6653(a) and section 6651(a), we find that petitioner is liable for the addition to tax for failure to pay estimated Federal income tax pursuant to section 6654(a) because his taxable income is hereby increased for taxable years 1965 and 1966 by the respective amounts of $115,000 and $20,000, representing income not subject to withholding.↩